Wyman **WESTBERRY**, Plaintiff,

v.

**GILMAN PAPER COMPANY** et al., Defendants.

Civ. A. No. 1146.

United States District Court, S. D. Georgia, Brunswick Division.

July 13, 1973.

**448**

Fletcher N. Farrington, Jr., Hill, Jones & Farrington, Savannah, Ga., for plaintiff.

John M. Gayner, III, Bennet, Gilbert, Gilbert & Whittle, Brunswick, Ga., for defendant Gilman Paper Co.

John J. Sullivan, Savannah, Ga., for individual defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

LAWRENCE, Chief Judge.

This action is brought by a former employee of Gilman Paper Company against that corporation, one of its vice presidents, its attorney and an agent. Plaintiff bases his claim for damages on 42 U.S.C. § 1985(3).[1] That Section of the Civil Rights Act of 1871 provides that where two or more persons conspire to deprive anyone of equal protection of the laws and commit or cause to be done any act in furtherance of the object of such conspiracy whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived has an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

It is alleged that plaintiff sought to obtain an investigation of possible violations by Gilman Paper Company of federal laws regulating air and water pollu-

tion and the payment of local property taxes. He claims that the defendants, Brumley, Harrison and Thomas, conspired to take his life and that in April, 1972, they offered a person a sum of money to kill him. Westberry alleges that there was a violation of his federal Constitutional rights of freedom of speech, association, petition and assembly and due process of law.

The defendants moved to dismiss the § 1985(3) claim on the ground that there was no basis of jurisdiction for federal relief under such statute. The motion was argued in February, 1972.

The jurisdictional dispute centered around the decision in Griffin et al. v. Breckenridge et al., 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338. In that case it was alleged that the defendants had deprived the black plaintiffs of their civil rights by stopping their automobile on a public highway and detaining and beating them.[2] The defendants were white, private citizens. The Supreme Court ruled that 42 U.S.C. § 1985(3) does not require state action under color of law and that private conspiracies are sufficient to confer jurisdiction on a federal court. The decision in *Griffin* overruled the twenty-year-old holding in Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 which held that an act under color of state law is a necessary ingredient of the cause of action provided by § 1985(3).[3]

A majority of the Justices said in *Griffin*: "The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action,

---

**1.** Jurisdiction is based on its jurisdictional counterpart, § 1343(1).

**2.** The complaint in Griffin v. Breckenridge alleged a violation of the rights of assembly, travel, petition, freedom of speech and due process.

**3.** The Supreme Court had noted in *Collins*: "We do not say that no conspiracy by private individuals could be of such magnitude and effect as to work a deprivation of equal protection of the laws, or of equal privileges and immunities under laws." 341 U.S. 662, 71 S.Ct. 942.

the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment." It was held that there must be an intent to deprive one of equal protection at the bottom of which there is "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." 403 U.S. p. 102, 91 S.Ct. at 1798. The Supreme Court did not undertake to decide whether a conspiracy motivated by discrimination "other than racial bias would be actionable" under § 1985(3). Post-*Griffin* decisions of lower federal courts have not drawn any distinction based on racial factors. See Cameron v. Brock et al., 473 F.2d 608, 610 (6th Cir.); Hughes et al. v. Ranger Fuel Corporation, Division of Pittston Company et al., 467 F.2d 6, 9 (4th Cir.).

In my Order of April 16, 1973, I overruled defendants' motions to dismiss, stating that the case ought not to be resolved on motion. I added that in the course of discovery the § 1985 claim might "come into clearer focus" as to the jurisdictional issue. The denial of the motion to dismiss was with "the caveat that the basic jurisdictional issue remains viable."

However, I expressed some doubt as to the maintainability of the § 1985(3) claim. In addition to *Griffin*, the Court cited Jacobson v. Industrial Foundation of Permian Basin, 456 F.2d 258 (5th Cir.); Place v. Shepherd, 446 F.2d 1239 (6th Cir.), and Bricker v. Sceva Speare Memorial Hospital, D.C., 339 F.Supp. 234. Since the ruling in *Griffin* several other decisions have come to my attention which seemingly point in the same direction. Among them are Hughes v. Ranger Fuel Corporation, *supra*; O'Neill v. Grayson County War Memorial Hospital et al., 472 F.2d 1140, 1144–1145 (6th Cir.); Jones v. Bales et al., 58 F.R.D. 453 (N.D., Ga.); Wade v. Bethesda Hospital et al., D.C., 356 F.Supp. 380, 384; Potts v. Wright et al., D.C., 357 F.Supp. 215, 219; Arnold v. Tiffany, D.C., 359 F.Supp. 1034.

One should compare Cameron v. Brock et al., *supra*, holding that § 1985(3) extends to a sheriff's election in which it was claimed that the incumbent and others conspired to violate the constitutional rights of persons opposed to his re-election. "We hold," said the Court, "that § 1985(3)'s protection reaches clearly defined classes, such as supporters of a political candidate." 473 F.2d p. 610. See also Ames et al. v. Vavreck, D.C., 356 F.Supp. 931 and McCurdy et al. v. Steele et al., D.C., 353 F.Supp. 629. In *Ames* it was held that a claim for relief under § 1985(3) was stated as against motion for summary judgment where it was alleged that police officers had conspired to deprive plaintiffs of federal constitutional rights. They had been arrested for operating a disorderly house and for selling liquor at a private residence where they gathered to protest construction of the Anti-Ballistic Missile system in North Dakota. In *McCurdy*, *supra*, the Court said, "On balance, plaintiffs' allegations of an overt conspiracy among one faction of Indians to deprive another of certain civil rights would appear cognizable under the statute." (at p. 639). See also Richardson v. Miller et al., 446 F.2d 1247 (3rd Cir.).

## THE WRONGFUL DISCHARGE CLAIM

This Civil Rights action was filed in the Brunswick Division on December 7, 1972. Among other things, it is alleged that Westberry was wrongfully discharged while arbitration under a union contract was pending in connection with his termination grievance. I ruled on April 16th that the pendency of the Civil Rights action in this Court was no obstacle to plaintiff and Gilman Paper Company proceeding with the arbitration of the grievance. Evidence was heard at St. Marys before William T. Murphy as Neutral Arbitrator on May 1st last. The transcript in that proceeding which is 200 pages long contains the testimony of fifteen witnesses. The

record has been filed in the present case, along with affidavits, depositions and exhibits in support of the motions for summary judgment of Gilman Paper Company and the three individual defendants.

A review of the evidence in the arbitration proceeding may bring the case and the legal issues into better perspective.

## THE ACID-POURING INCIDENT IN 1970

According to the record before this Court, the employment of Wyman Westberry was terminated by Gilman Paper Company on September 25, 1972. Plaintiff was discharged for allegedly pouring a toxic or acid-type liquid on a black employee (Rawls) on March 21, 1970, while the latter was using a restroom that had been exclusively used by white employees.

The origin of the litigation in this Court apparently goes back to the use by Negro employees of lavatory facilities at the St. Marys plant. The restrooms were *de facto* segregated. Raymond Dyals, a machinist and a member of the Grievance Committee of the local Union, testified that prior to the injury to Rawls he had a conversation with Westberry regarding the use by blacks of the toilets in the Maintenance Department. The plaintiff informed Dyals that a black man had come in and used the restroom and requested that he go to the company officials and try to have this prevented. Not long after this, Westberry told him that another black was using the restroom. Dyals conveyed these complaints to a Gilman official (Crawford) who told him "there was nothing that they could possibly do about it, it was here and we'd have to contend with it." According to Dyals,

he related this information to Westberry who replied, "There was something that could be done about it" and "if the right stuff was thrown on there, it wouldn't take but one time and it would alleviate the problem." The nature of the "stuff" was not identified but Dyals got the impression that it would probably cause serious injury to a person.[4] Apparently, this conversation occurred in the latter part of 1969. See Arbitration Case, Tr. 16–20.

J. T. Blount was employed by Gilman Paper Company as an instrument mechanic in 1970. He testified that there were two metal tanks in the caustic room which contained what is known as "white liquor." This liquid is used in the digesters and when steam is applied, acts to soften pulpwood; in Blount's words, "eats the wood so you can cook it."[5] Tr. 55. A night or so before Rawls received the burns the witness saw Westberry draw "white liquor" from one of the tanks and place it in a Wedac plastic jug, a container used to carry oil taken from a larger tank. Blount learned a day or two later that Rawls had been injured. Tr. 58–62. Asked why he did not say anything about it, this witness explained, "I might have been like a lot of the rest of them; I just don't want—the niggers was using our restrooms at that time and they was using our water fountains and our restrooms and I just didn't say anything about it." Tr. 62.

James McGhin who was employed as a welder at the time Rawls was injured testified that on the night of the acid-throwing incident he and Westberry were coming out of the restroom when a black worker entered it. Plaintiff said something like "Who does he think he is, using our restroom?" Tr. 69–70. Westberry then picked up a beaker from a

4. Rawls received first and second degree burns on his head and in the scrotum area. Tr. 10.

5. According to the record, "white liquor" is a caustic soda used in the processing

of paper and is capable of causing severe burns when the skin is exposed to it. Tr. 10.

nearby shelf which he (plaintiff) said contained "white liquor." He told McGhin that "he could get him out of there."[6] Tr. 71. Westberry proceeded to climb up on a rack over the toilet (it is also referred to as a "little ladder." Tr. 120. At that point, McGhin turned and left through a door and started up the stairs. Meanwhile, he "heard the nigger screaming." Tr. 74. Immediately thereafter, Westberry caught up with McGhin and told him that "he got his so-and-so out of there." Tr. 73–74.

McGhin testified that he saw Westberry "as he got up there, started to do it, and I took off as he got up there to do it." He would not admit that he saw plaintiff actually throw the liquid. He said he did not see it being poured because as Westberry "got up and started to commit the act, I left; I turned my back." After the Federal Bureau commenced an investigation into the case in the fall of 1970 Westberry visited McGhin. According to the latter, he said to him, "Wyman, you know this is the truth, just as good as anything" and that Westberry replied, "I'll do anything or give you anything you want if you will keep your mouth shut." Tr. 88–89. Subsequently, when the incident was aired at a Union meeting Westberry got up before the members, testified McGhin, and "said that he didn't do it, and I was sitting there knowing it and he dropped his head and wouldn't even look at me." Tr. 83.

Reverend William Carlton Owens, a Vocational Rehabilitation Counsellor and a Baptist minister, testified that in 1970 he was Pastor of St. Marys Baptist Church and that McGhin was a member of the congregation. Some months after the incident McGhin came to him and confided that he was aware of the identity of the person who perpetrated the act and that he was wrestling with his conscience about what to do. Reverend Owens said he encouraged him to tell the truth. Tr. 123; also 78. Another witness, Marvin C. Jordan, a welder, testified at the Arbitration hearing that the night after the incident he had a conversation with McGhin who told him that he had a secret to tell which he wanted him to keep under his chest. He thereupon divulged that Westberry had poured acid on a black construction worker. Jordan later saw plaintiff and asked him about the incident. Westberry said, "I didn't pour acid on him, I poured white liquor on him." Tr. 125–127.

Westberry has consistently denied any involvement in the incident. Q. "Did you, in fact, throw any acid on anybody?" A. "No sir." Tr. 140. He denied that he placed "white liquor" in a plastic container. Tr. 155–156. The minutes of a meeting of the members of Local No. 1128, I.A.M., apparently held in September, 1972, recite that "Brother Westberry stated he was innocent." Tr. 185. When plaintiff was handed the termination letter on September 25th that year, Cecil Gay, vice chairman of the Union, who was present, testified that Westberry asked the Gilman representative, "Why are you firing me when I'm not guilty and not showing no information?" Tr. 192–193. Plaintiff was deposed by the defendants on February 2, 1973. He testified that he did not know the name of the injured black employee and had heard only general talk on the subject. Westberry Deposition, 12–13.

The wrongful discharge of Westberry is pleaded as an overt act in the conspiracy of the defendants. The foregoing summary of the testimony in connection with the termination of his employment

6. Bobby Mallard who was employed by Gilman as a shipping supervisor testified that on the morning before Rawls was injured he was in the storeroom and that Westberry came in and asked the storekeeper for something to put acid in. The storekeeper at first replied he had nothing but then handed the plaintiff a glass quart jar beaker. Tr. 40–41.

is perhaps more pertinent to the arbitration proceeding than to the motions for summary judgment in the § 1985 action. A decision has not been made by the Arbitrator. Nothing in the present litigation can affect or influence his findings in the grievance claim. Anything this Court may decide does not bind the Arbitrator and what he may find is not binding in this action.[7]

It is clear, in any event, that questions of fact and of credibility exist as to the grounds of termination of employment which preclude any summary judgment by this Court. However, in the conspect of things, what occurred on the night of the acid-pouring incident is significant to proper understanding of the claim of a conspiracy and resulting denial of plaintiff's constitutional rights.

## CONSPIRACY TO TAKE WESTBERRY'S LIFE

The other overt act and the one primarily relied on by plaintiff is his claim that the defendants conspired to take his life by offering money to someone to kill him. According to the complaint, "On or about April 9, 1972, defendants Brumley, Thomas and Harrison, acting on behalf of defendant Gilman Paper Company, conspired among themselves to deprive plaintiff of his life. In furtherance of said conspiracy, Brumley, Thomas and Harrison offered to one Lawrence Brown, Sr., a sum of money if he, Brown, would kill plaintiff. Brown refused said offer of money, and reported same to plaintiff."

Westberry testified at the arbitration hearing that George Beaver called him one day and said he wanted to talk to him. When they met, Beaver told him, "Would you believe that George Brumley, Robert Harrison and Tommy Thomas has offered somebody money to kill you?" Tr. 142. After receiving this information Westberry asked him to set up a meeting with the person who had been requested "to kill me." He met with Lawrence E. Brown, an employee of Gilman Paper Company, whom he had previously known. According to the plaintiff, Brown told him that Brumley, Harrison and Thomas had offered him money to kill Westberry. "I said to myself, well, if this guy is telling the truth, he won't mind telling the F.B.I. this, so I asked Mr. Brown, I said, will you tell the F.B.I. this? And he said, yes." Deposition, p. 19.

The record contains an affidavit by Brown dated May 15, 1972. Brown deposed that Beaver and Westberry approached him to make "some kind of deal"—a story they wanted him to tell. He was to say that he called George Beaver on the job; and that thereafter the latter was to call Westberry who was to meet him at the gate. "Me and George was to be discussing our union problem then we was going to walk over to my automobile. When I got over to the car Wyman was to call me a nigger and push me. When he pushed me I was to get my pistol and blow him out (kill him)." In accordance with the plan, Brown was then to go to Thomas's house and pick up $1500 cash. He was to say that Thomas, Brumley and Robert Harrison would see to it that if he went to court, he would make no time. Affiant was to state that he had been approached by these three individuals.

According to Brown's affidavit, Beaver and Westberry told Brown that if he betrayed them, they would first say that he was lying and "next they would kill me or have me killed." Affiant stated that he received $600 or more which was deposited by Beaver in a bank at Kingsland. Brown said that he was hired by Westberry and Beaver and a prominent resident of Camden County. According

---

**7.** Except that unjust enrichment which results from duplicate monetary relief in the public and private forums in a labor grievance case is not permissible. Hutch-ings v. United States Industries, Inc., 428 F.2d 303 (5th Cir.); Rios v. Reynolds Metals Company, 467 F.2d 54 (5th Cir.).

to his affidavit, he went to Tommy Thomas, a defendant herein, and told him the story.

On May 31, 1972, George A. Beaver signed an affidavit which is part of the record in this case. He swore that a prominent resident of Camden County was planning to bring a "very profitable" damage suit against Gilman Paper Company and thought that the chances of an "out-of-court" settlement would be increased if Brown would say that Brumley, Harrison and Thomas had hired him to kill Westberry. According to Beaver's affidavit, the following story was concocted:

"Tommy Thomas was to call Lawrence Brown and ask him to meet him at Ralph Bunch High School. Tommy Thomas was driving a big green car with Robert Harrison and George Brumley present. Tommy Thomas was then to proposition Lawrence Brown to kill Wyman Westberry in the following way: That Lawrence Brown was to call me concerning a union problem and I was to get in touch with Wyman Westberry who would meet us at the front gate. We were to walk out towards Lawrence Brown's car. On the way there, Wyman Westberry was to call him a nigger, this was to upset Lawrence Brown and I was to intervene and when I did, Lawrence Brown was to pull out his pistol and shoot Wyman Westberry. Tommy Thomas was going to have witnesses to verify the story and Lawrence Brown was to leave the parking lot and go to Tommy Thomas' house where he would receive $1,500.00 and Tommy Thomas would see to it that Lawrence Brown did not go to jail. . . ."

Brown and Beaver subsequently signed retractions of their statements. In another affidavit by Lawrence Brown dated May 25, 1972, he repudiated what he had said in a prior affidavit. He explained that he was forced by Tommy Thomas to change his statement that Thomas, Harrison and Brumley had offered him money to kill Westberry. According to Brown, Thomas and two other men came to his house on the night of May 9th and pointed guns at him. They took him to Thomas's house where he spent two nights. They later went to Vero Beach where they stayed four days. Brown was subpoenaed to appear before a federal grand jury at Savannah on May 17th and drove with Thomas to that city. The latter told him "that if I didn't say what he told me to say that he would blow my brains out . . . He also told me that if I told what he wanted me to say, I would receive $10,000 and a lifetime job."

George Beaver signed (apparently in June, 1972) a retraction of the affidavit he had given on May 31st of that year. In the recanting statement, witnessed by a notary, he set forth at length the background of his giving the prior affidavit. His account is long and rambling but it repudiates what he had previously sworn to in regard to the hiring of Brown.

These "counter affidavits" were not timely filed. I directed counsel in a letter dated May 30, 1973, that any additional affidavits be filed prior to June 11th which was four days before the hearing date of the motions for summary judgment. The "counter affidavits" were filed along with the response of plaintiff on July 11th. However, I will permit the filing of the tardy affidavits. With or without them, no summary disposition could be made in respect to the alleged action of defendants in hiring Brown to kill Westberry. Although Brown and Beaver may be self-confessed perjurers or false swearers, the ultimate question of their credibility is one for the jury, not for the Court.

## EXISTENCE OF CONSPIRACY

■ Jurisdiction in a § 1985(3) action requires proof of a conspiracy and overt acts pursuant thereto. Kitchen v. Crawford, D.C., 326 F.Supp. 1255, 1262;

**454**

aff'd. 442 F.2d 1345 (5th Cir.). In the absence of conspiracy a grant of summary judgment is in order. Postel v. Franklin County Water District et al., 470 F.2d 189 (5th Cir.). The evidence or showing as to the existence of a conspiracy is thin. I am reluctant, however, to grant summary judgment on the theory of its absence. In such cases circumstantial evidence, inferences and motive weigh heavily. Deterjet Corporation v. United Aircraft Corporation, D. C., 211 F.Supp. 348.

It has been held that if there is a single act of discrimination by a single business entity the fact that two or more agents participated in the act does not constitute a conspiracy under § 1985. Dombrowski v. Dowling, 459 F.2d 190, 196 (7th Cir.). Here, the individual defendants are all officers, employees or agents of Gilman Paper Company. However, I do not deal with that aspect of the alleged conspiracy.

## LACK OF CLASS-BASED ANIMUS

■ In Griffin v. Breckinridge the Supreme Court was at pains to avoid any interpretation that would turn § 1985(3) into "a general federal tort law." 403 U.S. at 102, 91 S.Ct. 1790. Given a conspiracy and overt acts in furtherance thereof with intent to deny any person of constitutional rights, jurisdiction may nevertheless still be wanting. *Griffin* makes it clear that § 1985(3) was not intended to cover *all* conspiracies to interfere with the rights of others. The core of jurisdiction is that the conspiracy and the acts in furtherance must stem from a "class-based" animus. I take this to mean that, in the absence of racial motivation, jurisdiction in a § 1985 action requires a conspiracy to deny equal protection of law to a member of an identifiable class of persons as distinguished from a single individual. Otherwise, "class-based" motivation is a hollow phrase.

■ Plaintiff is empaled on this jurisdictional hurdle. No racial factor exists, that is, none except what happened to Rawls in the restroom that night. Westberry is white. He is not a member of any identified group or class against which defendants have invidiously discriminated. The overt acts claimed to have been in furtherance of the alleged conspiracy were directed against the plaintiff as an individual, not as a representative or member of any clearly defined class. As in Wade v. Bethesda Hospital, *supra,* at 834 "There has been no allegation by the plaintiff, nor does the Court find, that she was a member of a class, which fact motivated the defendants to invidiously discriminatory action." A showing of purposeful discrimination toward an individual with no allegation of racial or otherwise class-based motivation is insufficient under § 1985(3). Hughes v. Ranger Fuel Corporation, *supra,* 467 F.2d at p. 10. In Arnold v. Tiffany, *supra,* 359 F.Supp. 1036 the District Court said that the *Griffin* test means "that kind of irrational and odious class discrimination akin to racial bias—such as discrimination based on national origin or religion."

■ While "color of law" is not necessary to a § 1985 action, plaintiff makes a gesture in the direction of "state action". He alleges that he was subjected to harassment and surveillance by the St. Marys police force. Deposition, pp. 27, 33–34. This does not strengthen the jurisdictional foundation of the action. It is also alleged that the acts of defendants were designed to obstruct and hinder plaintiff's efforts to obtain an investigation of the environmental policies of Gilman Paper Company and its payment of city property taxes. Deposition, p. 30. Such claim is merely conclusory where specific facts are demanded. Eisman v. Pan American World Airlines, D.C., 336 F.Supp. 543; Post v. Payton, D.C., 323 F.Supp. 799.

It could be claimed that Westberry was a member of some group or class that opposed the corporation's practices and sought reform of its pollution and tax policies. But there is nothing to show that Gilman Paper Company conspired with its agents to strike at any such class or group of employees or persons. And, as stated in Arnold v. Tiffany, supra, to conclude that § 1985(3) was "intended to embrace the class urged here—a newspaper dealers' trade association—would, in effect, amount to treating that section as a general federal tort law."

Plaintiff has failed to show existence of any class-based, invidiously discriminatory animus behind the alleged actions of the conspirators. Accordingly, the motions of defendants for summary judgment are granted and the complaint is dismissed on the ground of lack of jurisdiction. The pendent state tort claim goes out with the federal case. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218.