**Wyman WESTBERRY,
Plaintiff-Appellant,**

v.

**GILMAN PAPER COMPANY et al.,
etc., Defendants-Appellees.**

No. 73–3268.

United States Court of Appeals,
Fifth Circuit.

Jan. 22, 1975.

Rehearing En Banc Granted March
18, 1975.

Opinion Withdrawn May 23, 1975.

Lewis R. Morgan, Circuit Judge, dissented with opinion.

Fletcher N. Farrington, William T. Coleman, III, Savannah, Ga., for plaintiff-appellant.

John M. Gayner, III, Brunswick, Ga., Guy O. Farmer, II, Jacksonville, Fla., John J. Sullivan, Savannah, Ga., for defendants-appellees.

Before GOLDBERG, GODBOLD and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

This case pushes us to the frontiers of Fourteenth Amendment interpretation. We must address ourselves to a question which the Supreme Court postponed in Griffin v. Breckenridge:[1] does the Fourteenth Amendment,[2] through the vehicle of 42 U.S.C. § 1985(3),[3] provide a

1. 1971, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338.

2. Sections 1 and 5 of the Fourteenth Amendment read:

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

3. Section 1985(3) provides, in relevant part:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any

cause of action against purely private parties?

■ Today we hold that the amendment and the statute operate in tandem to provide such a cause of action. In so holding, we join a unanimous en banc decision by the Eighth Circuit[4] and a decision by the Third Circuit.[5]

## I

Our discussion begins with Griffin v. Breckenridge, supra, in order to establish the background against which we evaluate the matter sub judice.

In Griffin v. Breckenridge, Negroes traveling on a Mississippi highway were stopped and beaten by white private citizens. The beatings were racially motivated; defendants acted on a mistaken belief that the plaintiffs were civil rights workers. The Supreme Court found that plaintiffs had a 1985(3) cause of action. In his opinion for the Court, Justice Stewart first held that by its history and on its terms the statute would cover the action. 403 U.S. 96–102, 91 S.Ct. 1790. In debate on the provision, which originated as section 2 of the Ku Klux Klan Act of 1871, Congress appears to have assumed that it reached private action. And, while section 1 of the Act explicitly pertains to actions under color of law, section 2 lacks any wording establishing such a requirement. Moreover, since other parts of the Ku Klux Klan Act related to lesser degrees of state involvement than that encompassed in section 1, section 2 must have been intended to reach purely private action if it was not to be mere surplusage. Finally, the

Court noted that the Act is directed in part against people who "go in disguise on the highway", which people are unlikely to be officers on their governmental rounds.

In coming to its decision the Court found that two aspects of a 1985(3) action were not dependent on the literal terms of the statute itself. First, the Court read the words "equal protection" and "equal privileges" in the statute to mean "the equal enjoyment of rights secured by the law to all" free from all interference. 403 U.S. 102, 91 S.Ct. 1798. Second, the Court limited liability under the statute to those instances in which there is some "racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." 403 U.S. at 102, 91 S.Ct. at 1798.

Justice Stewart then went on to discuss the constitutional bases upon which such a statute could rest. While the statute was passed under the Fourteenth Amendment and its language is identical to language used in the Fourteenth Amendment, the Court avoided a discussion of the strength of such a foundation. Rather, the Justices concluded unanimously that the Thirteenth Amendment empowers Congress to determine what the badges and incidents of slavery are and to create a statutory cause of action for those deprived "of the basic rights that the law secures to all free men". 403 U.S. 105, 91 S.Ct. 1800. In addition, eight Justices found that interstate travel is constitutionally protected as a right and privilege of national citi-

---

State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws;

. . . . .

in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

**4.** Action v. Gannon, 8 Cir. en banc, 1971, 450 F.2d 1227. Chief Judge Matthes did not take part in the decision. The opinion, by Judge Heaney, is especially well researched on the questions of the applicability of Section 1985(3) to private actors and the legislative history of the Fourteenth Amendment, which the Court in Action finds was meant to apply to non-state perpetrators.

**5.** Richardson v. Miller, 3 Cir. 1971, 446 F.2d 1247; see also, Cameron v. Brock, 6 Cir. 1973, 473 F.2d 608; cf., Thomas v. Economic Action Comm., 5 Cir. 1974, 504 F.2d 563.

zenship, does not necessarily rest on the Fourteenth Amendment, is assertible against private interference and is within the power of Congress to protect by appropriate legislation. 403 U.S. 105–106, 91 S.Ct. 1790.

## II

Plaintiff in the instant case, Wyman Westberry, is a white man who was employed at defendant Gilman Paper Company's [Gilman or the Company] Saint Marys, Georgia, mill. Defendants George Brumley, Robert Harrison and Tommy Thomas were, respectively, executive vice-president, counsel and an agent of the Company. Plaintiff claims that he was active in local environmental groups which were attempting to secure investigations of the Company for possible violations of federal pollution laws. He also claims that he sought to reform the local tax structure, which he felt resulted in Gilman's paying too little in taxes; and that he supported local candidates who were opposed by the Company. He alleges that the three individual defendants, acting for Gilman, conspired to take his life, and conspired and effectuated his dismissal from his job. He claims their action denied him the equal protection of the laws of the United States and Georgia, including the rights to speech, association and assembly, petition for redress of grievances, security of person and his right not to be deprived of life, liberty or property without due process of law. Defendants, on the other hand, deny that there was any conspiracy to kill Westberry and claim that he was fired because he had poured acid on a black worker who was using the formerly all-white restroom at the mill.

In his final order below, 60 F.R.D. 447, the district judge maintained:

It could be claimed that Westberry was a member of some group or class that opposed the corporation's practices and sought reform of its pollution and tax policies. But there is nothing to show that Gilman Paper Company conspired with its agents to strike at any such class or group of employees or persons . . .

Plaintiff has failed to show existence of any class-based, invidiously discriminatory animus behind the alleged actions of the conspirators. Accordingly, the motions of defendants for summary judgment are granted and the complaint is dismissed on the ground of lack of jurisdiction.

We disagree with the resolution of the trial judge.

In the arbitration hearings on Westberry's termination, which were made part of the trial court record, see Arbitration Hearing Record, pp. 203–204, the following colloquy took place between the plaintiff and a lawyer for the Company:

Q Now, this newspaper dated September, 1972, which is marked as an exhibit, this is not the first time that you've had your name in the newspaper as being critical of the Gilman Paper Company, is it?

A Let's see. When I testified before the Federal Grand Jury at Savannah, there was a statement there which I did not make. I never met the individual who printed the story. I don't know where he got the story from, but I did testify before the Federal Grand Jury in Savannah and I think somebody printed it. I was millwright at the Gilman Plant.

Q Now, isn't it a fact that you have been openly critical of the Company for several years?

A If telling the truth is being openly critical, I have told the truth.

Q And the truth as you see it and have spoken of it are things that the Company has done wrong in its relationship with the community on environmental issues. Is that correct?

A Yes, sir.

Q So, back to my original question: September of 1972 was not the first time that you have been outspokenly critical of the Gilman Paper Company?

A As far as in the newspaper, I would say September 19th proba-

bly was, because I made no statement prior to that.

**Q** It's a matter of common knowledge that you were extremely active insofar as the environmental issue and the Paper Company is concerned. Isn't that a fact?

**A** I don't know if it was common knowledge.

**Q** Well, is it true?

**A** That I was what, now?

**Q** That you were openly critical of the Gilman Paper Company in connection with their allegedly polluting the environment.

**A** Yes.

Nor did the defendants allege facts in affidavits, depositions or testimony at the arbitration hearing which in any way sought to counter plaintiff's testimony about his environmental activism. If anything, defense counsel's remarks in the arbitration hearing support plaintiff's contention on this issue. See Arbitration Hearing Record p. 11. Thus plaintiff had no F.R.C.P. Rule 56(e) responsibility to make a further pre-trial showing of his environmental activities or memberships.

The district judge also made clear that he was not granting summary judgment for lack of a showing by plaintiff of a conspiracy to murder.

■ We believe that the indication of Westberry's alignment with environmental causes, coupled with the judge's finding on the conspiracy to murder issue raises a sufficient inference that there may have been a "class-based, invidiously discriminatory animus behind the alleged actions of the conspirators" to evidence subject matter jurisdiction in the district court under § 1985(3) and to raise genuine issues of material fact which make summary judgment inappropriate. Keating v. Jones Development of Missouri, Inc., 5 Cir. 1968, 398 F.2d 1011, 1013; Harvey v. Great Atlantic and Pacific Tea Co., 5 Cir. 1968, 388 F.2d 123, 124; Marsden v. Patane, 5 Cir. 1967, 380 F.2d 489, 491. We note in this re-

gard that "[t]he court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind." Croley v. Matson Navigation Co., 5 Cir. 1970, 434 F.2d 73, 77; NLRB v. Smith Industries, Inc., 5 Cir. 1968, 403 F.2d 889, 895.

### III

Justice Stewart has shown us that by its terms, context and legislative history § 1985(3) was intended to apply to private acts. He further remarks that the judicial standard of review of such statutes supports such an interpretation, for, since Collins v. Hardyman, 1951, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253, the Court has accorded Reconstruction civil rights statutes "a sweep as broad as their language", which standard would allow the application of § 1985(3) here.

### (A)

There is no precedential lighthouse pointing us to a constitutional mooring in this case. We must find such a constitutional basis, of course, before a statute may be used for any particular purpose.

■ Plaintiff's 1985(3) action cannot be sustained under the Griffin Court's Thirteenth Amendment rationale. The aim of the amendment is to provide protection for racial groups which have historically been oppressed, Jones v. Mayer, 1968, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 or those chafing under the hands of involuntary servitude. Clyatt v. United States, 1905, 197 U.S. 207, 25 S.Ct. 429, 49 L.Ed. 726. Plaintiff is neither in a racially oppressed group nor serving involuntarily.

The Supreme Court has found jurisdiction for statutory protection where the deprivation has been worked by "state action", whose finding summons the constitutional patronage of sections 1 and 5 of the Fourteenth Amendment. See, e. g., United States v. Price, 1966, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267. In this case, however, state officers do not appear to be either the generators or the mechanisms of the claimed deprivation.[6]

---

**6.** In a deposition, Westberry made some conclusory remarks that he felt he was being

watched by city officials. The only incidents he alleges are that the Fire Chief drove down

Finally, Griffin's "right to travel" rationale cannot, of course, dispose of this case since neither the aim nor the effect of the alleged conspirators' acts was to infringe on plaintiff's freedom of movement.[7]

### (B)

Initially, we must determine whether First Amendment protections, which plaintiff here invokes, are binding on the states through the Fourteenth Amendment. Second, we must see whether section 5 of the Fourteenth Amendment allows Congress to pass legislation effective against private parties if Congress believes such legislation is necessary to insure due process and equal protection of the laws.

■ 1. The guarantees in the First Amendment are protected by the Fourteenth Amendment. See, e. g., Williams v. Rhodes, 1968, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24; Cox v. Louisiana, 1965, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471; New York Times Co. v. Sullivan, 1964, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686; Edwards v. South Carolina, 1963, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697; N.A.A.C.P. v. Button, 1963, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405, and cases collected in Action v. Gannon, 450 F.2d 1227, 1234 n. 9. The Fourteenth Amendment no more allows the state to say "this ballotbox or platform shall be open to Republicans and Democrats only" than to say "this pool shall be open to white persons only".

■ 2. There are three reasons for believing that private discriminatory acts come within the purview of section 5 of the Fourteenth Amendment should Congress believe that a preclusion of such acts is helpful in insuring the effectuation of section 1. First, we find such an indication in the legislative history behind the Act. Second, we find such a conclusion expressed by a majority of the members of the Supreme Court sitting in United States v. Guest, 1966, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239. Third, decisions in previous cases, allowing a cause of action, are difficult to distinguish from the case before us.

(a) Unfortunately, responses to the question of whether the Fourteenth Amendment applies to private intrusions on legal rights have not been uniform among the legislators who drafted it, nor among the theses of the metaphysicians who have pondered the intentions of these legislators. Most commentators, however, believe that the drafters and supporters of the Fourteenth Amendment intended that section five of the amendment should allow Congress to legislate in regard to private actions.

Thus Prof. H. E. Flack wrote in his The Adoption of the Fourteenth Amendment (1908):

. . . [A]ccording to the purpose and intention of the Amendment as disclosed in the debates in Congress and in the several state Legislatures and in other ways, Congress had the constitutional power to enact direct

---

Westberry's street while he was talking to two F.B.I. agents, and then circled back; that, after Westberry told the F.B.I. about the threat on his life, a policeman watched his house one night; and that another unidentified policeman—in this town of 3,400 people—told him to stay out of politics. Westberry cites no evidence to connect any of these alleged incidents to the defendants, nor have these officials been made a party to this suit.

7. We note in this context that legislative jurisdiction in this case may not even require a Fourteenth Amendment basis. In Griffin v. Breckenridge, supra, the right to interstate travel was used as an alternative basis for the Court's holding. Justice Stewart noted that "the 'right to pass freely from state to state'" has been explicitly recognized as "among the

rights and privileges of national citizenship." Many commentators agree with the Court that such a right is an aspect of the fundamental liberties to be guaranteed all Americans. See sources collected in Note, The Right to Travel: Another Constitutional Standard for Local Land Use Regulations? 39 U.Chi.L.Rev. 612, 632 n. 115 (1972). But no theory which has come to our attention holds that such a right is more "fundamental" than the rights guaranteed in the First Amendment or explains why that principle should apply against "private" actions where First Amendment principles should not. Thus we conclude that the rationale the Supreme Court relied upon to support this conception of the right to travel—as a kind of basic interest protected against all—should be applicable to the rights of speech and association as well.

legislation to secure the rights of citizens against violation by individuals as well as by States.

*Id.* at 277. J. tenBroek provides evidence that "the protection intended was not merely against state action." His Antislavery Origins of the Fourteenth Amendment (1951) states:

That proof consists of the emphasis, at the hearing of the Joint Committee on Reconstruction, on individual violation of the rights of freedmen and southern loyalists . . . The index to the report of the hearings contains two full pages of entries on "Freemen, evidence of general hostility and occasional cruelty towards," . . . Witness after witness spoke of beatings and woundings, burnings and killings, as well as deprivations of property and earnings and interference with family relations—and the impossibility of redress or protection except through the United States Army and the Freedmen's Bureau . . .

The evidence of individual invasions of the rights of Negroes particularly, but also of loyalists, accordingly, was not fortuitously brought forward as an unimportant incident of other matters regarded as primary. Elicited mainly by leading questions, the evidence was deliberately adduced by the committee for its bearing upon a principal feature of the proposed amendment, the precise wording of which was at the very moment under discussion by the committee. There can be little doubt not only that the members of the committee were aware of these individual violations but that the majority of the committee took pains to get them into the record— an odd procedure, to say the least, if they were not to be comprehended within the amendment which the committee was then perfecting.

*Id.* at 186–87.

tenBroek concludes:

While section 1 of the Fourteenth Amendment was thus declaratory and confirmatory, section 5 corrected the one great constitutional defect, the one pressing want which years of systematic violation of men's natural rights had demonstrated. It gave Congress power to protect those rights. The violations and denials most often mentioned were, of course, those occurring under state laws and carried on by state officials. These were the sources, the perpetrators, of flagrant, commonly observed, and systematic invasions of those rights. But the absence of and need for protection against private invasions were adverted to almost as frequently.

*Id.* at 217.

We also note the conclusion reached by Prof. R. J. Harris in his Quest for Equality (1960):

[D]espite differences of opinion concerning the scope of congressional power under the amendment, a majority of the members of the Thirty-ninth, Forty-second, and Forty-third Congresses, some of whom were members of all three and of the Committee of Fifteen on Reconstruction, believed that the equal protection clause did more than condemn official or state action. They believed that it vested Congress at the very least with a primary power to set aside unequal state laws and a secondary power to afford protection to all persons in their enjoyment of constitutional rights when the states failed in their primary responsibility to do so either by neglecting to enact laws or by refusal or impotence to enforce them.

*Id.* at 53. *See also,* Frantz, Congressional Power to Enforce the Fourteenth Amendment Against Private Acts, 73 Yale L.J. 1353 (1960).[8]

(b) Guest v. United States, *supra,* involved the efforts of private individuals

---

**8.** Much of the contrary argument comes from the pen of Alvin Avins, who contends that most supporters of the Fourteenth Amendment did not intend that it apply to private intrusions. See Avins, The Ku Klux Klan Act of 1871: Some Reflected Light on State Action and the Fourteenth Amendment, 11 St. Louis U.L.J. 331 (1967).

to deny the use of public facilities to black citizens. Justice Stewart wrote for the Court that state action could be found in that the defendant's scheme looked toward causing the arrest of Negroes on false reports of criminal activity. But in their agreement with the result, six Justices rested on the conclusion that state action need not be found and that section 5 of the Fourteenth Amendment would allow Congress to pass a statute which reached purely private action. Justice Clark, joined by Justices Black and Fortas, said in concurrence:

> . . . [T]here now can be no doubt that the specific language of § 5 empowers the Congress to enact laws punishing all conspiracies—with or without state action—that interfere with Fourteenth Amendment rights.

383 U.S. at 762, 86 S.Ct. at 1180, 16 L.Ed.2d at 252.

Justice Brennan was joined by Chief Justice Warren and Justice Douglas in a partial concurrence. He said:

> A majority of the members of the Court expresses the view today that § 5 empowers Congress to enact laws punishing *all* conspiracies to interfere with the exercise of Fourteenth Amendment rights, whether or not state officers or others acting under the color of state law are implicated in the conspiracy. Although the Fourteenth Amendment itself, according to established doctrine, "speaks to the State or to those acting under the color of its authority," legislation protecting rights created by that Amendment, such as the right to equal utili-

zation of state facilities, need not be confined to punishing conspiracies in which state officers participate. Rather, § 5 authorizes Congress to make laws that it concludes are reasonably necessary to protect a right created by and arising under that Amendment; and Congress is thus fully empowered to determine that punishment of private conspiracies interfering with the exercise of such a right is necessary to its full protection. . . .

> Viewed in its proper perspective, § 5 of the Fourteenth Amendment appears as a positive grant of legislative power, authorizing Congress to exercise its discretion in fashioning remedies to achieve civil and political equality for all citizens.

383 U.S. at 782–784, 86 S.Ct. at 1191.

(c) Third, as Professor Cox has noted,[9] it is difficult to find a distinction between the power of Congress to regulate private interference with constitutionally protected rights in other instances and the Congressional power to prevent the sort of interference plaintiff alleges here.

A long-standing series of circuit court cases, Bullock v. United States, 6 Cir. 1959, 265 F.2d 683, cert. denied, 1959, 360 U.S. 909, 932, 79 S.Ct. 1294, 3 L.Ed.2d 1260; Kasper v. Brittain, 6 Cir. 1957, 245 F.2d 92, cert. denied, 1957, 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46; Brewer v. Hoxie School Dist. No. 46, 8 Cir. 1956, 238 F.2d 91, have upheld judicial power to deal with individual activities aimed at preventing the state from performing its Fourteenth Amendment duties.[10] These

---

9. Cox, Foreword: Constitutional Adjudication and the Promotion of Human Rights, 80 Harv. L.Rev. 91, 108–121 (1966).

10. In Congress of Racial Equality v. Clemmons, 5 Cir. 1963, 323 F.2d 54, this Court held that plaintiff city officials could not bring a 1985(3) action against private persons. But each of the reasons given reflects circumstances clearly distinguishable from those of the instant case. In Clemmons the court noted "[t]he absence of a purpose on the part of the defendants to deprive anyone of equal protection of the laws. . . ." 323 F.2d at 61. In the instant case, the plaintiff-appellant alleges just such a purpose. In Clemmons the Court stated that the claim was

defective because there was no deprivation of federally created rights enforcible on the states since defendants had only blocked traffic. In the instant case, plaintiff-appellant does claim a denial of federally created rights. Finally, the Clemmons Court relying on the authority of Collins v. Hardyman, 1951, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253, held that 1985(3) and the Fourteenth Amendment did not apply to private actions. Since the decision in Clemmons Griffin v. Breckenridge, *supra,* has specifically held that 1985(3) covers private actions; six Justices of the Supreme Court in United States v. Guest, have held that the Fourteenth Amendment can reach private actions and the Court in Griffin has said that, at the least, the applicability of

cases have rested on judicial authority but as Professor Cox writes "The power of Congress, acting under section 5, to reach private obstructions to the fulfillment of a state's Fourteenth Amendment duties must be at least as broad as the authority of the courts." [11]

 The *Brewer, Kasper* and *Bullock* cases differ from the instant case in only one respect—the immediacy of the relationship between the state and the injured person. In criticizing a distinction based on this ground, Prof. Cox notes: "In this view, the lynching of a Negro in the custody of the state might be made a federal offense, because of the relationship between the police officials and the prisoner, but the United States could not punish a homicide on Boston Common even though it resulted from racial prejudice, because there would be no relationship between the victim and the state." 80 Harv.L.Rev. at 116. A constitutional distinction cannot reasonably rest on the mere presense or absence of a non-injuring state representative if we are to retain the amendment's focus on protection of the victim. Once it is recognized that private actors may be curtailed to insure equal protection of the laws, Congress has the responsibility to determine at what point along the continuum of private activities it wishes to provide a cause of action.

Further authority for our decision today is drawn from other Supreme Court cases, whose logical implication is that Congress has the power to punish private actors who interfere with enjoyment of Fourteenth Amendment protections. In United States v. Waddell, 1884, 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673, a conspiracy was aimed at driving a homesteader from his federally bequeathed land. The conspirators could be punished under Congressional mandate since they tried to frustrate the enjoyment of a federal right. In Logan v. United States, 1892, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429, private conspirators were held open to prosecution for attempting to do violence to a prisoner

in the hands of a United States Marshal. Professor Cox notes that in Waddell and Logan:

> The rights of the homesteaders and federal prisoners were against the United States. If those rights implied an obligation of private parties not to interfere with the receipt of benefits under the relationship, the grant of a right to. equal protection against a state might, by the same reasoning, be held to imply an obligation of private parties not to interfere with the receipt of benefits under the individual's relationship with the state. A fortiori one could infer that Congress was given power to impose such a duty as implementary legislation.

80 Harv.L.Rev. at 113, (footnote deleted).

The words of a majority of the Court in Guest and the implications of these other cases independently indicate that Congress has the power under section 5 of the Fourteenth Amendment to reach private acts.

## IV

 Our disposition in the present case by no means implies the creation of a federal tort law. Powerful limitations exist on the right to bring an action under section 1985(3).

First, of course, the terms of the statute itself must be met. This requires that the complainant show that there was a *conspiracy*; that such conspiracy be for the *purpose* of depriving an individual of the equal protection of the laws; that the conspirators *acted* in furtherance of their conspiracy; and that the plaintiff was *injured* in his person or property or actually deprived of a citizen's right or privilege. Second, as the Supreme Court noted in Griffin: "[T]he language [of 1985(3)] requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." 403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348.

the Fourteenth Amendment to private persons is an open issue.

**11.** 80 Harv.L.Rev. at 112, (1966).

Third, "equal protection" does not mean that a person has a right to be treated equally in every instance of his existence. There is no "deprivation" of a "right" where other constitutional provisions create a right in another party to act in a way which functionally creates barriers for a potential section 1985(3) plaintiff. Perhaps most importantly, no one could sustain an action based upon every exclusionary act since the First Amendment creates a right of free association whose significance in some instances substantially outweighs the value of "equal treatment" to environmentalists.

■ Finally, there is discretion in the United States Congress to decide that, in fact, certain forms of action are not necessary additions to the judicially enforcible substantive terms of the Fourteenth Amendment. Of course, Congress may not act in such a way as to deny to the judiciary the power to enforce Fourteenth Amendment guarantees. Katzenbach v. Morgan, 1966, 384 U.S. 641, 651 n. 10, 86 S.Ct. 1731, 16 L.Ed.2d 828.

## V

Constitutional viability is not a theorem, it is a fact in our volatile jurisprudence, without which the past would stultify the present and the heavy hand of history would stunt our ethical growth and enervate our powers to meet governmental responsibilities. Here, we do not erect a new structure for a constitutional law of torts but rather enter a door which Griffin left ajar.

In his opinion, Judge Lawrence reviewed the multitude of issues which this case involved and presented to us a full view of the legal theories and factual conclusions under which he operated. While we disagree with his ultimate conclusion, we are grateful for the manner in which he has expedited the judicial process.

■ In order to prevail at trial Westberry must show that he was a member of a class of environmentalists, or of a tax equity group. A solo and subjective commitment would not seem to be enough to meet the "class-based animus"

requirement. There need not necessarily be an organizational structure of adherents, but there must exist an identifiable body with which the particular plaintiff associated himself by some affirmative act. It need not be an oath of fealty; it need not be an initiation rite; but at least it must have an intellectual nexus which has somehow been communicated to, among and by the members of the group. Once such a nexus is established the burden will fall to defendants—to show that, in fact, there was no "class-based discriminatory animus" to their actions.

Reversed and remanded.

LEWIS R. MORGAN, Circuit Judge (dissenting):

I respectfully dissent from the majority. The majority opinion turns 42 U.S.C. § 1985(3) into a "general federal tort law." In Griffin v. Breckenridge, 403 U.S. 88 at 102, 91 S.Ct. 1790, 29 L.Ed.2d 338, the Supreme Court clearly avoided any such interpretation. In an able opinion which discusses thoroughly the issues of law, Judge Alexander A. Lawrence dismissed this action on the ground of lack of jurisdiction. There is nothing I could add to the opinion of the district court. See, 60 F.R.D. 447.

I would affirm the district court.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

### BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

It is ordered that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed.

The Clerk will specify a briefing schedule for the filing of supplemental briefs.

PER CURIAM:

Since it appears that the matters giving rise to this cause are moot, the opinion of this court, 507 F.2d 206 (5th Cir. 1975), is withdrawn, and the previous judgment of this court is vacated. The judgment of the district court is likewise vacated, and the cause is remanded to the district court with directions to dismiss as moot, so that it will spawn no legal precedents. *See* United States v. Munsingwear, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); Troy State University v. Dickey, 402 F.2d 515 (5th Cir. 1968).