UNITED STATES of America,
Plaintiff-Appellee,

v.

George W. BRUMLEY, Sr., Robert W.
Harrison, and William T. Thomas,
Defendants-Appellants.

No. 76–1895.

United States Court of Appeals,
Fifth Circuit.

Oct. 14, 1977.

Rehearing Denied Dec. 5, 1977.

Chester Bedell, John A. DeVault, III, Jacksonville, Fla., for Brumley.

John J. Sullivan, Savannah, Ga., Lacy Mahon, Jr., Jacksonville, Fla., for Harrison and Thomas.

William T. Moore, Jr., U. S. Atty., Augusta, Ga., Judith E. Wolf, Appellate Section, Civil Rights Div., J. Stanley Pottinger, Asst. Atty. Gen., Walter W. Barnett, Atty., Appellate Section, Civil Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before COLEMAN, MORGAN and TJOFLAT, Circuit Judges.

COLEMAN, Circuit Judge.

This criminal case was once pursued to exhaustion by Wyman Westberry as the plaintiff in a civil rights suit, see *Westberry v. Gilman Paper Company*, 60 F.R.D. 447 (S.D., Ga., 1973).[1]

The controversy is here on a second appellate visit as the result of a criminal prosecution on substantially the same facts, handled by the Civil Rights Division of the Department of Justice.

Westberry's activities, with their accompanying consequences, were recited in detail by the District Court in its disposition of the civil rights lawsuit, 60 F.R.D. 450–453. Too lengthy for incorporation in the body of this opinion, that recitation is annexed as an Appendix hereto by way of general background.

October 15, 1975, the United States grand jury, sitting at Savannah, indicted the individuals whom Wyman Westberry had previously sued: George W. Brumley, Sr., Vice President and resident manager of the Gilman Paper Company at St. Marys, Georgia; Robert W. Harrison, longtime attorney, former legislator, and local counsel for Gilman; and William T. Thomas, an employee of Gilman.

Count 1, 18 U.S.C. § 1622, charged that these defendants "did willfully suborn, instigate, induce, and procure one Lawrence E. Brown falsely to testify [May 17, 1972] to a material matter in which the grand jury was concerned", that is "whether George W. Brumley, Sr., Robert W. Harrison, and William T. Thomas offered Lawrence E. Brown a sum of money to kill one Wyman Westberry"; that as a result of the subornation Brown did falsely testify *"in substance* and *to the effect* (emphasis ours) that he had never been offered a sum of money by Brumley, Harrison, and Thomas to kill Wyman Westberry". The indictment does not set forth the specific questions, or the answers which the government charges to have been perjurious. The alleged perju-

ry, nevertheless, is specifically stated: the defendants had never offered Brown a sum of money to kill Westberry.

Count 2 charged that all three of the defendants did knowingly and willfully use a false and fictitious document in violation of 18 U.S.C. § 1001 in that they did cause a false statement [with reference to the solicitation to kill] by one George A. Beaver, dated May 31, 1972, to be delivered to the United States Attorney for the Southern District of Georgia.

Count 3 charged Thomas, alone, with making a false statement in regard to the same matter to Agents Jones and McGuire of the Federal Bureau of Investigation on May 24, 1972.

Count 4 charged a similar false statement by Thomas on June 10, 1972, to Special Agents Jones and Cook of the Federal Bureau of Investigation. This concerned a trip to Vero Beach, Florida, but in connection with the same solicitation to kill.

A nine day jury trial resulted in the conviction of all three defendants on all pending counts. Each defendant was sentenced to imprisonment for a year and a day.

This appeal was argued in Atlanta, March 17, 1977. The voluminous trial record, the generally ephemeral character of much of the testimony, and several unusual legal issues necessitated prolonged analysis, delaying ultimate decision until now.

These convictions are infected with fatal deficiencies and infirmities, hereinafter related.

## I. FACTUAL BACKGROUND

As indicated *supra*, the appellants were all associated with the Gilman Paper Company of St. Marys, Camden County, Georgia. Gilman was by far the largest employer in the county. In June of 1971, Wyman Westberry, at that time an employee of the paper company, met with the United States

---

1. The Judgment of the District Court dismissing Westberry's personal lawsuit was reversed and remanded, one Judge dissenting, *Westberry v. Gilman Paper Company*, 5 Cir., 1975, 507 F.2d 206. The case, however, was ordered reheard en banc, 507 F.2d 215. Later, the panel opinion was withdrawn and the prior judgment vacated for mootness, 507 F.2d 216.

Attorney in Brunswick, Georgia, purportedly to discuss alleged political intimidation in Camden County during the 1970 election for the state legislature (the exact nature of which does not appear in the record) and also the existing tax agreement between the town of St. Marys and Gilman. Nothing seems to have come of this conference. In 1970 and 1971 Westberry had contact with the Ralph Nader organization concerning water and air pollution allegedly caused by Gilman Paper Company. As a consequence of this contact, the Nader group investigated Gilman. Results of this investigation were published in a book and in two national magazines. This publicity stimulated the interest of the producer of the CBS television program "Sixty Minutes". With the active assistance of Westberry, a television show on the Gilman Paper Company was prepared and telecast. In addition, Westberry set up a meeting with a high Georgia official to discuss the tax agreement between Gilman and St. Marys. What, if anything, came of that conference is left to speculation.

At the least, it may safely be said that Westberry, previously accused of pouring acid on a black man who used a previously white toilet, was vigorously and unrelentingly pursuing a vendetta against Gilman, launching any available missile in the direction of his employer. Moreover, the employer was well aware of what Westberry was doing.

The foundation for the government's case was constructed around the uncorroborated testimony of Lawrence Brown that William Thomas approached him and offered to pay him $1,500 to kill Wyman Westberry. Brown said at the trial that he agreed to do it, but insisted on assurances from those higher up than Thomas that Brown would not be prosecuted. A meeting was arranged between Brown and the three defendants at an abandoned high school.

This is what Brown told the trial jury on direct examination:

Q. Let me draw your attention now to a couple of days later, Sunday evening, May 9, 1972,[2] just before dark, did you have occasion to go to Woodbine [county seat of Camden County], Ralph Bunche High School?

A. Yes.

Q. How did you get there?

A. Drove my car.

Q. Did you arrive first?

A. No.

Q. All right, tell us what you saw when you got there?

A. When I turned off the highway 17 and went to the school, sitting back off the road, on the south end of the building there was a green Lincoln parked there, with three white males standing on the outside on the driver's side. So, I pulled up to the car, parked, and got out, and we spoke to one another.

Q. Do you know who the white males were?

A. Yes.

Q. Who were they?

A. George Brumley, Robert Harrison and Tommy Thomas.

Q. So, you walked up to them?

A. Yes.

Q. All right, tell us what happened when you walked up?

A. Well, the first thing we talked about was the malpractice suit, Robert Harrison didn't want me to talk to nobody, or be out talking to nobody about it because it would ruin the whole case.

Q. Then what happened?

A. Then Tommy went into details again about killing Wyman Westberry.

Q. All right, tell us about that.

A. He said "Lawrence, I'm going to tell you again, and we all stood close together. He said I'm going to tell you how I want you to do it, if you're not going to do it, I don't want to hear about it again, if I do, I know you told it, and I'll stand on your toes and say you're telling a lie."

---

2. If the meeting did, in fact, occur, it took place on April 9, not May 9.

Q. Then what happened?

A. Then he told me how he wanted me to do it again.

Q. Tell us about that.

A. Wanted me to call George Beaver at his station, have George Beaver to call Wyman, we'd both meet at the gate, and I was going to present them with a racial case that I was having a problem on the job, and we was going to walk over towards the car, just before getting to the car, I was going to strike George and kill Wyman.

Q. Now, did Mr. Brumley say anything?

A. No, he nodded his head. I told Tommy that I would do it for the fifty thousand dollars, no less.

Q. You wanted fifty thousand?

A. That's right.

Q. Did Mr. Harrison say anything?

A. No.

Q. Who did all the talking?

A. Tommy Thomas.

Q. They just nodded their heads? [Leading question]

A. Like that (nodding affirmatively).

Q. All right, so you asked, you wouldn't do it for any less than fifty thousand dollars? [Leading question]

A. That's correct.

Q. What did he say to that?

A. Well, Tommy said, "Lawrence, have I ever lied to you?" I said "No, Tommy." He said "I won't now."

Q. Mr. Brown, lets get right to the bottom line. Did you intend to kill Wyman Westberry for that money?

A. No.

Q. Tell us what you intended?

A. Rip them off for the money.

Q. Rip them off for the money?

A. Yes.

Q. Did you think you were going to get the whole fifty thousand in advance?

A. No, in my mind at that time, I didn't, but I did have an idea I would get something.

It will be observed that, according to Brown, neither Brumley nor Harrison said anything. Brown said first that Mr. Brumley nodded his head but did not include Harrison in that gesture and he never included Harrison unless it be assumed from his response to the leading question: "They [without further identification] just nodded their heads?", to which Brown responded, "Like that [nodding affirmatively]".

On at least three occasions, Brown repudiated this story under oath: once before the sheriff of Camden County and representatives of the Georgia Bureau of Investigation, once before a notary public in Vero Beach, Florida, and once before the federal grand jury in Savannah.

In any event, Brown testified to the trial jury that the next day after the Woodbine meeting, he met with George Beaver and related to him the events of the high school meeting. Relying on this report, Beaver called Westberry and "warned" him of the plot.

On April 14, 1972, Brown and Beaver met with Lamar Walters of the United States Attorney's Office, Savannah, and gave him their version of the solicitation to kill Westberry. On April 19, the Georgia Bureau of Investigation (GBI) interviewed Brown concerning the matter. At that time, Brown talked to Thomas on the telephone and, while a GBI agent listened, Brown stated he was ready to go ahead with the deal [no names called and no details mentioned], to which Thomas responded, "Cool it, we will talk about it tomorrow at work".

Five days later GBI agents placed a listening device on Brown's body and recorded Brown's activities during eight hours at work. Included in the tape was a twelve minute conversation with Thomas [unintelligible to the jury], during which Thomas described Westberry, Brown stated he was ready to go through with the deal, but Thomas told him to wait up awhile.

### The Alleged Perjury

Further pursuing Brown's trial version of events, on May 8, Thomas told Brown that the plot against Westberry had gotten out into the open, offering him $10,000 and a

lifetime job at Gilman Paper Company if he would say that there never had been an offer to kill Westberry but he was to say, instead, that George Beaver had offered to pay Brown $10,000 if he would say that the defendants had plotted Westberry's murder. Brown agreed to this proposal. Brown then gave a signed statement to local law enforcement officials, May 10, explaining that Beaver and Westberry had offered Brown $10,000 to say that Brumley, Harrison, and Thomas had hired him to kill Westberry.

On May 15, Thomas took Brown to a public stenographer in Vero Beach, Florida, where Brown made a similar written statement under oath. Two days later, Brown testified to the grand jury in Savannah, the essence of which will appear later.

George Beaver also testified that on May 19, two days after Brown had given his testimony to the grand jury, Thomas told Beaver "about Brown's testimony before the grand jury" [although Thomas, of course, had not heard it] and that Brumley intended to fire Beaver for his alleged activities. Beaver denied to Thomas that he had ever made such an offer to Brown. On May 30, after several more meetings between the two, Thomas told Beaver that they wanted him to corroborate Brown's story in return for favorable advancement opportunities within the paper company and protection from any prosecution. After Thomas implied that Beaver might be indicted by the Camden County grand jury based on Brown's story, Beaver agreed to go along with what Thomas wanted. However, in addition to what Thomas offered, Beaver demanded that two bank loans of his be paid off, and that he be provided some money for moving expenses. As a cover for paying off the loans, Beaver agreed to transfer land to Seaboard Enterprises. On May 31st, after meeting at the St. Marys Bank to conclude the land transfer, Thomas and Beaver drove to the State District Attorney's office in Jesup, Georgia, where Beaver signed an affidavit coinciding with Brown's testimony to the grand jury. A copy of this statement was later sent to the U.S. Attorney by the attorney representing all three defendants.

On May 24th, in response to questions by FBI agents about the plot against Westberry, Thomas denied that he had hired Brown to kill Westberry, and told the agents that Brown had informed him that Beaver had asked Brown to make up the story that the defendants had offered Brown $1,500 to kill Westberry.

On June 10th, FBI agents interviewed Thomas again, this time concerning his trip to Vero Beach with Brown on May 15. The agents warned Thomas that he was suspected of kidnapping Brown on that trip to Florida. In a signed statement given to the agents, Thomas stated that Brown had asked for protection, and that Thomas and two other men drove Brown to Jacksonville on May 9th, and to Vero Beach on May 15, for Brown's protection.

## II. THE APPELLATE ISSUES

Separate briefs have been filed on behalf of George Brumley, individually, and on behalf of Robert Harrison and William Thomas, jointly. Issues shared by all appellants are: (1) failure of the indictment to charge an offense; (2) insufficiency of the evidence to convict; (3) failure by the court reporter to transcribe bench conferences occurring during open trial in violation of the Court Reporters Act, 28 U.S.C. § 753; (4) submission to the jury of a transcript prepared from an unintelligible tape recording; and (5) admission by the trial judge of evidence beyond the scope of the government's bill of particulars.

In addition, appellant Brumley complains of ineffective assistance of counsel, of the trial judge's determination of the materiality of the alleged perjurious testimony as a matter of law, and of an instruction to the jury not to consider a shoplifting conviction against Lawrence Brown in weighing his credibility.

Harrison and Thomas argue that evidence of local politics, pollution by the Gilman Paper Company, and national publicity concerning that pollution was irrelevant, and its admission over defense objection was prejudicial error.

### III. A THRESHOLD ISSUE

Why the federal prosecutors became involved in this case is unclear. The government does not claim that the meeting in Woodbine and the purported agreement to kill Westberry, if such took place, was a federal crime. The Assistant United States Attorney testified only that the United States grand jury was convened for the purpose of investigating possible "improprieties" in the Camden County legislative election which took place in 1970. He thought there might have been a violation of 18 U.S.C., § 245, "having to do with force and threats of force as threatening voters to influence their vote". The Assistant United States Attorney further suggested that Westberry "was a government witness, or a potential government witness, a threat against his life tended to substantiate the other allegations otherwise attempt to kill him. The grand jury, of course was to look into that, was there any other reason for a plot, and, if there was a plot was it because of his—the information he had provided the government or was likely to provide in the future".

The real nature of what Westberry had revealed, or might be expected to testify to, was not stated.

When asked to tell why Brown was subpoenaed before the grand jury, the Assistant United States Attorney answered:

"Well, according to the information we had, he was the man that was supposed to do the killing. He was the man hired to do the killing."

Against this testimony, intended to support the jurisdiction of the federal grand jury for looking into the event in the first place, we have to contrast the following:

1. In his appearance before the grand jury Brown was never asked any question about any connection between the alleged plot and any violation of the federal election laws or any information provided by Westberry.

2. The transcript of all the proceedings before the grand jury was not filed in the court below and has not been filed in this Court. From the four corners of the record and from oral argument we deduce, however, that the inquisitorial body never examined any witness on the subject of federal election law violations in Camden County or concerning any federal connection between the solicitation to kill and Westberry's evidence, already given or anticipated. In all of his many contradictory statements under oath, Brown, a devastatingly impeached witness, never assigned any motive for the alleged solicitation and never mentioned a connection with the federal election laws or information provided the government by Westberry.

3. To the contrary, the government was allowed to develop, to prejudicial length, the controversy about pollution and local taxation of Gilman, throwing in all the details of how the Sixty Minute program had been put together. There is no escaping the fact that the government introduced these matters, not violations of federal election laws, as the motivation for the alleged effort to dispense with the earthly existence of Westberry.

The special grand jury adjourned without indicting anybody in connection with any of these topics. The Assistant United States Attorney testified that Brown's grand jury testimony "stopped the investigation cold". He did not say why this was the case, but the answer is obvious. The grand jury was not concerned with federal election law violations. It was probing a purely local occurrence, an alleged solicitation to have someone murdered for purposes of retaliation or revenge.

This generates the impression that this grand jury was convened to investigate a matter which most likely was beyond its jurisdiction. Since, however, there are other fatal infirmities in this case we need not pursue this point, but we are not willing to leave the impression that we are unaware of its presence, nor is the validity of this unusual procedure to stand as approved by implication.[3]

---

**3.** This case is remarkably like *Brown v. United States,* 8 Cir., 1957, 245 F.2d 549, in which it was held that a false statement before a grand jury acting beyond its authority is not perjury

## IV. THE GENERAL LAW OF PERJURY IN FEDERAL JURISPRUDENCE

Since the argument of this case in Atlanta, the Fifth Circuit has issued a comprehensive review of federal perjury law, *United States v. Damato,* 5 Cir., 1977, 554 F.2d 1371.

It was there held that (1) materiality is an essential element of the offense, i. e. the false testimony must be capable of influencing the tribunal on the issue before it; (2) the government bears the burden of proving materiality; (3) materiality is a question for the court, not the jury [in our present case the jury was allowed to hear the testimony directed toward materiality]; (4) the findings on materiality must be included in the instructions to the jury, informing the jury of the factual basis for the charge; (5) the entire record concerning the alleged perjury should be introduced.

Another recent case is *United States v. Slawik,* 3 Cir., 1977, 548 F.2d 75. With reference to false statements allegedly committed before a grand jury, 18 U.S.C. § 1623 (1970), the indictment set forth the subject matter of the grand jury's investigation, that which the government contended was material to the investigation, and the specific material as to which the defendant allegedly gave false testimony, *but the indictment did not state why or how these areas of inquiry were material to the grand jury investigation.* The Court held that the conviction could not stand "where the indictment fails to set forth the precise falsehood alleged and the factual basis of its falsity with sufficient clarity to permit a jury to determine its verity and to allow meaningful judicial review of the materiality of those falsehoods".

The Third Circuit cited *Bronston v. United States*[4] "that if the prosecutor never asks the critical question and never presses for an unequivocal answer the defendant may not be convicted of false swearing".

## V. BRUMLEY'S APPEAL ON COUNTS 1 AND 2

■ Taking the testimony of the Assistant United States Attorney at face value, and there was no other evidence on the subject, the material issue for investigation by the federal grand jury was whether there was probable cause to charge any individual with violations of federal voting laws in Camden County in the Georgia legislative elections of 1970. The trial below, however, was converted into a prosecution for subornation of perjury, not about violations of federal election laws but whether there had been a solicitation on a Sunday afternoon in Woodbine to kill the accused acid thrower, Wyman Westberry.

Even on the latter premise, however, the government did not prove its case against Brumley. No witness took the stand to say of his own knowledge that Brumley had said or done anything to influence Brown's testimony before the grand jury. The nearest the government ever came to implicating Brumley in the alleged perjury was that Harrison had reported over the telephone on May 10 that Brown wanted to repudiate his story about the solicitation to kill. Brumley refused to see Brown and said that if he had a statement to make it should be given to the local authorities.

As an officer of the St. Marys Bank, Brumley may have known of the loan to Seaboard Enterprises to buy Beaver's property, but this loan was initiated two weeks after Brown had testified before the grand jury and, as a matter of fact, the President of the Bank testified, without dispute, that he handled the $2,000 loan on his own responsibility, without prior contact with Brumley.

On this evidence, no jury could reasonably conclude beyond a reasonable doubt that Brumley knowingly acted to "suborn, instigate, induce and procure" Brown to testify falsely before the grand jury as

and further holding that the defendant had been convicted on insufficient evidence.

4. 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973).

charged in the indictment. The District Court should have directed a verdict of acquittal or entered a judgment of acquittal in favor of Brumley on Count 1. *Vick v. United States,* 5 Cir., 1954, 216 F.2d 228, 232; *South v. United States,* 5 Cir., 1969, 412 F.2d 697; *Petite v. United States,* 4 Cir., 1959, 262 F.2d 788, *remanded on other grounds,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490.

As to the second count, the government stands on no firmer ground. To support this count the government relies on a letter written by an attorney representing the defendants, forwarding Beaver's May 31 affidavit to the United States Attorney's office which contained the sentence "[E]nclosed is an affidavit of Mr. George A. Beaver in the above matter which my clients have requested that I foward (sic) to you so that you in turn may make it a part of the record in this matter".

This letter was written and sent long after Brown had testified before the grand jury. There is not a scintilla of evidence in the record to show that Brumley directed, or knew in advance, of the transmittal of the letter. Indeed, the evidence is to the contrary.

Brumley's conviction can only be explained by the admission of the lengthy testimony about pollution, about the Nader investigation, and about the CBS "expose", in all of which, as Gilman's local manager, Brumley was held up in the worst possible light on matters irrelevant to the indictment.

The trial court should have ordered the acquittal of Brumley for failure of the government's proof. Upon the receipt of our mandate the District Court will enter judgments of acquittal in favor of Brumley on both counts of the indictment returned against him.

## VI. THE APPEALS OF HARRISON AND THOMAS AS TO COUNT 1, THE SUBORNATION OF PERJURY CHARGE

 Harrison and Thomas were entitled to directed verdicts of not guilty or judgments of acquittal on this count.

This is the pertinent portion of Brown's testimony before the May 17, 1972 grand jury:

Q. All right, now, tell us about this $1,500.00 offer to you, how that came about? Who were you supposed to kill—Westberry?

A. Wyman Westberry.

Q. All right, tell us about that?

A. Well, it was a story that I was supposed to tell . . .

\* \* \* \* \* \*

Q. You told the story then?

A. Yes.

\* \* \* \* \* \*

Q. . . . Who did you tell me had approached you about killing Westberry? You didn't tell me that Beaver had approached you about killing Westberry. You told me somebody else. Who did you tell me?

A. I told you that Tommy Thomas approached me.

Q. And didn't you also mention other names?

A. I told you Tommy Thomas, Robert Harrison and George Brumley. Those were the three guys I told you approached me. I told you that they approached me at the Ralph Bunche High School, which is a Negro school in Woodbine, and I told you that it was at the southeast of the building.

Q. Was there in fact, any such meeting?

A. No.

The indictment charged, Count 1, paragraph 4, that, having been suborned to do so, Brown did "falsely and knowingly and contrary to said oath, testify in substance and to the effect that he had never been offered a sum of money by Brumley, Harrison and Thomas to kill Wyman Westberry".

A mere reading of the foregoing transcript of Brown's grand jury testimony reveals that he was never specifically asked whether these men had offered him a sum of money to kill Wyman Westberry.

Government counsel, conducting Brown's examination, knew precisely what Brown's testimony was expected to be, he was in position to delineate precisely when and in what way Brown varied from this expected testimony, and he easily could have seen to it that Brown gave clear, unequivocal answers to precise questions. He could have asked, "Did Brumley, Harrison and Thomas at any time or place offer you $1,500 to kill Wyman Westberry?" He chose not to do so, but the indictment is based on the assumption that had Brown been asked he would have denied that the offer had been made by the named defendants.

Under the authorities cited *ante*, this attempted foundation for a perjury prosecution fails for lack of specificity, for lack of the critical question, and for lack of the unequivocal answer.

The indictment does not allege that the denial of the meeting was perjurious. The government asks this Court to hold that because Brown denied the meeting he, in effect, denied that he had been offered a sum of money to kill Westberry. We are asked to assume that if Brown had been specifically asked about the offer he would have denied that also. The irrefutable fact, however, is that Brown was not asked, hence there was no denial. Especially in perjury cases, defendants may not be assumed into the penitentiary.

■ As Mr. Chief Justice Burger remarked in *Bronston, supra*, "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry", 409 U.S. at 360, 93 S.Ct. at 601. "Precise questioning is imperative as a predicate for the offense of perjury", 409 U.S. at 362, 93 S.Ct. at 602.

■ When reversal is based on an insufficiency of evidence and the appellant makes a motion for a new trial in the District Court, the usual practice in this Circuit is to remand with directions for a new trial. *Greene v. Massey*, 5 Cir., 1977, 546 F.2d 51, 56. However, when the government would be unable to expand its evidence at a second trial to cure the patent

defect, no purpose would be served by remanding for a new trial, and dismissal of the indictment is appropriate. *United States v. Koonce*, 8 Cir., 1973, 485 F.2d 374, 382.

The written record of Brown's testimony cannot be altered. Harrison and Thomas must be acquitted on Count 1.

*Materiality*

Furthermore, all three defendants should have been acquitted on Counts 1 and 2 because the government failed its burden on the issue of materiality.

■ Basic to a prosecution for subornation of perjury is proof by the government that the false statement was material to the hearing, in this case the grand jury investigation. *United States v. Hvass*, 355 U.S. 570, 78 S.Ct. 501, 2 L.Ed.2d 496 (1958); *Williams v. United States*, 5 Cir., 1957, 239 F.2d 748, *cert. denied*, 353 U.S. 975, 77 S.Ct. 1061, 1 L.Ed.2d 1138. A false statement is material if it is capable of influencing the investigation. *United States v. Gremillion*, 5 Cir., 1972, 464 F.2d 901, *cert. denied*, 409 U.S. 1085, 93 S.Ct. 683, 34 L.Ed.2d 672.

■ The question then is whether a false statement concerning a *1972* solicitation to kill Wyman Westberry could have hampered, influenced, or impeded the grand jury investigation of violations of 18 U.S.C., § 245 in the *1970* legislative election in Camden County.

The government had the burden of showing materiality, but the truth is that beyond the vague, unsupported assertions of the Assistant United States Attorney, discussed *ante*, Part III, such a showing was altogether lacking. Indeed, here is what the special prosecutor emphasized in his argument to the jury:

"Question number one, was there in fact a plot against the life of Wyman Westbury, and if so, who was responsible for that plot. You are examining a crime of this nature. The first thing you have to ask is who has the motive? Remember that old triology, motive, means, opportunity. Who had the motive if such a plot

did exist for taking the life of Wyman Westbury? Examining that mode of evidence, ask yourself these questions. You heard of all of Westbury's activities. You heard about how he brought in Nader's people, and how it resulted in the book the Water Lords. And, the national magazine, Harpers, publishing the article. You heard about how he was the contact man for CBS and how when Nader's people, and CBS's people came into the St. Mary's how Wyman Westbury was the man who set it all up. How he let them hold the interviews at his house. How he went out and got the people for them to interview. Wyman Westbury was the man."

The thrust of this argument is crystal clear. Westberry was not to be killed on account of any federal election law violations. As the prosecutor understood it, and as he told the jury, the motive was revenge—revenge for putting Nader after Gilman, for all of the unfavorable publicity in the magazines, and for setting up the CBS television program. This was a stark contradiction of the materiality vaguely asserted by the United States Attorney in his testimony, testimony which we have already found to have had no support in the evidence.

■ For a total failure to establish the indispensable ingredient of materiality, the convictions of Harrison and Thomas must be reversed, *Brooks v. United States*, 5 Cir., 1958, 253 F.2d 362, *cert. denied*, 357 U.S. 927, 78 S.Ct. 1374, 2 L.Ed.2d 1372. Materiality is so totally lacking, and the probabilities of establishing it are so remote, that this is an additional reason for requiring the

District Court to enter a judgment of acquittal for Brumley on Count 1 and also necessitates acquittals for Harrison and Thomas on that count.[5]

## COUNT 2 AS TO THE DEFENDANTS, HARRISON AND THOMAS

■ As already recited in our discussion of the case against Brumley, Count 2 also charged Robert W. Harrison and William T. Thomas with a violation of 18 U.S.C. § 1001, in that on or about May 31, 1972, these defendants did cause George A. Beaver to make a false and fictitious affidavit stating in substance and to the effect that Beaver, Westberry and one Carl M. Drury offered Brown $10,000 to state that Harrison, Brumley, and Thomas offered Brown $1,500 to kill Westberry and that they did cause that statement to be delivered to the U.S. Attorney for the Southern District of Georgia.

Count 2 further charged that at all times "stated herein" it was material as to whether Brumley, Harrison and Thomas offered one Lawrence E. Brown a sum of money to kill one Wyman Westberry.

For the reasons already herein appearing in our analysis of Count 1, this Count foundered and sank irretrievably on the shoals of materiality.

On remand, the District Court will enter judgments of acquittal in favor of Harrison and Thomas on this count.

## COUNTS 3 AND 4 AGAINST THOMAS

We consider it in order, for the sake of clarity, to footnote both these counts.[6]

5. It is elemental, of course, that a defendant is not guilty of subornation of perjury unless the perjury is, in fact, committed, *Meyers v. United States*, 1949, 84 U.S.App.D.C. 101, 171 F.2d 800, *cert. denied*, 336 U.S. 912, 69 S.Ct. 602, 93 L.Ed. 1076; *Catrino v. United States*, 9 Cir., 1949, 176 F.2d 884. In *Meyers* it was held that a defendant cannot be convicted of subornation of perjury if the allegedly suborned witness did not testify as the count charged he did, no matter how unorthodox, unpatriotic, reprehensible or criminal the defendant's conduct might have been.

6. *COUNT THREE*

THE GRAND JURY FURTHER CHARGES:
 1. That on or about May 24, 1972, in St. Marys, in the Southern District of Georgia, William T. Thomas did knowingly and wilfully make a material, false and fictitious statement concerning a matter within the jurisdiction of the Federal Bureau of Investigation; that is to say:
 2. On May 24, 1972, in St. Marys, in the Southern District of Georgia, Thomas was interviewed by Special Agents Lewis P. Jones and John P. McGuire of the Federal Bureau of

They charge Thomas with violations of 18 U.S.C. § 1001, the making of material false and fictitious statements on matters within the jurisdiction of the Federal Bureau of Investigation. They charged the same materiality that appeared in Counts 1 and 2. They must fail for the same reasons which destroyed the government's case on those counts.

As to Count 3, Special Agent McGuire did testify that on May 24 he interviewed Thomas regarding election improprieties. Strangely enough, he did not state the nature of the suspected violations, or the questions asked, or the answers given on that subject, not a word. The indictment does not charge Thomas with making any materially false statements with regard to election law violations. McGuire testified that his investigations turned up no such violations (transcript of testimony, page 613). His testimony was concentrated on the alleged solicitation to kill Westberry but there was not a whisper as to how this might have been related to any federal offense, real or suspected.

Count 4 charges that the circumstances and reasons for Thomas' and Lawrence Brown's journeys to Vero Beach, Florida, *was material*, that Thomas falsely stated that he had gone to Vero Beach to "protect" Brown, and then the count returned to the ever present premise that the reason for the journeys and stays in Florida was to suborn Brown to commit perjury in testifying before the federal grand jury scheduled to meet in Savannah on May 16, 1972, therefore, the "protection" excuse was false.

Although the indictment does not allege it, McGuire testified that he interrogated Thomas because he was suspected of kidnapping Brown and taking him across the state line to Vero Beach. He found no evidence to support that charge. Indeed, Brown was armed on that journey and hardly likely to be the victim of a kidnapping. Brown testified that he was not afraid of Thomas and voluntarily made the trip to Vero Beach. If the "protection" story was false, it did not hinder, impede, or

Investigation; both Agents Jones and McGuire identified themselves as Special Agents of the Federal Bureau of Investigation;

3. It did then and there become, and at all times mentioned herein was, a material matter whether one George W. Brumley, Sr., one Robert W. Harrison and said Thomas had offered one Lawrence E. Brown a sum of money to kill one Wyman Westberry;

4. Thomas knowingly and wilfully stated in substance and to the effect that he had been told by Brown that Westberry and one George Beaver offered Brown $10,000 to state that Brumley, Harrison and Thomas offered Brown $1,500 to kill Westberry;

5. Said statement by Thomas to Agents Jones and McGuire was fictitious and false, as Thomas then and there well knew that Brown had never made such a statement to Thomas.

In violation of Title 18, United States Code, Section 1001.

#### COUNT FOUR

THE GRAND JURY FURTHER CHARGES:

1. That on or about June 10, 1972, in St. Marys, in the Southern District of Georgia, William T. Thomas did knowingly and wilfully make a material false and fictitious statement concerning a matter within the jurisdiction of the Federal Bureau of Investigation; that is to say:

2. On June 10, 1972, in St. Marys, in the Southern District of Georgia, Thomas was interviewed by Special Agents Lewis P. Jones and David B. Cook of the Federal Bureau of Investigation; both Agents Jones and Cook identified themselves as Special Agents of the Federal Bureau of Investigation;

3. It did then and there become, and at all times stated herein was, material as to the circumstances of and reasons for Thomas and Lawrence E. Brown journeying to the vicinity of Vero Beach, Florida on or about May 11, 1972 and for Brown remaining in Florida from on or about May 11, 1972 until May 15, 1972; and for Thomas again journeying and remaining in the Vero Beach, Florida vicinity from on or about May 12, 1972 until May 15, 1972;

4. Thomas knowingly and wilfully stated in substance and to the effect that the circumstances of and reasons for Thomas and Brown going to and remaining in Florida on said occasions was to "protect" Brown;

5. Said statement by Thomas to Agents Jones and Cook was fictitious and false, as Thomas then and there well knew that the circumstances of and reasons for said journeys and stays in Florida was to suborn, instigate, induce and procure said Brown to commit perjury when testifying before the Federal Grand Jury scheduled to meet in Savannah, in the Southern District of Georgia, on May 16, 1972.

In violation of Title 18, United States Code, Section 1001.

influence the FBI investigation into the suspected kidnapping which turned out to have been wholly without foundation.

Counts 3 and 4 must go the way their predecessor counts have gone.

The District Court will acquit Thomas of these charges, see *United States v. Carter,* 5 Cir., 1976, 526 F.2d 1276; *United States v. Krause,* 5 Cir., 1975, 507 F.2d 113, 118.

## OTHER ERRORS

Since we are directing the acquittal of all defendants on all charges, the recitation of reversible errors might well stop at this point. Still, in our opinion, there were other errors of such magnitude that they ought not to be left unmentioned.

■ Brumley's and Harrison's motions for severance should have been granted. Thomas was the chief, *almost altogether the sole,* actor and talker in all of the controversy over whether the solicitation to kill had been made and in the subsequent activities with Brown. Brumley never had any personal contact with Brown after the meeting of April 9. Neither did Harrison, although he did make the arrangements for Beaver to see the state's attorney, acting on representations from Thomas. Brumley and Harrison were yoked with Thomas and dragged along in his current in a manner that practically guaranteed that they could not, and would not, receive fair and impartial treatment at the hands of the jury.

■ Another serious point is that the defendants were not indicted for conspiracy. Yet, the lengthy transcript reveals that the case was tried from beginning to end as if it were for conspiracy. We do not prolong this opinion to catalog the innumerable instances in which proof, over objection, was admitted as to what Thomas said and did outside the hearing and presence of Brumley and Harrison. Objections of defense counsel against hearsay were altogether futile. If it were not for the other controlling points in this case we would be compelled to reverse the convictions of Brumley and Harrison on this point alone.

■ Evidence *in extenso* was introduced by the government concerning the national publicity about pollution allegedly caused by the Gilman Paper Company. Evidence of Nader's investigation, articles in the magazines, and the television expose was developed to the last drop, calculated to brand the defendants as unconscionable polluters. In his opening statement to the jury the special prosecutor was careful to point out that this publicity had an adverse effect: "Where was the ownership of Gilman Paper Company? Where were they? New York City." The Company was also pictured as an indefensible tax chiseler. It was argued that this was relevant to motive for the alleged desire to liquidate Westberry. To a point, this was so, but it undoubtedly was expanded far beyond the necessary limits of relevancy and undoubtedly to the prejudice of the defendants who were not on trial for polluting or tax chiseling but for suborning perjury.

### Unreported Bench Conferences

The record shows that the practice in this particular District Court is not to report bench conferences held between court and counsel, in the presence but out of the hearing of the jury. We have counted 21 such unreported conferences in this record, nearly all of them concerning objections raised by defense counsel. Quite often, the trial court recorded no ruling at all. Frequently, the examination proceeded as if there had been no conference. From a reading of adjoining portions of the record, we can infer that in some instances objections were overruled or sustained, but we have no record of it.

■ The Court Reporters Act, 28 U.S.C. § 753(b) directs that the reporter "shall record verbatim . . . all proceedings in criminal cases held in open court." While this requirement is mandatory, *Stephens v. United States,* 5 Cir., 1961, 289 F.2d 308, and is *not* to be overridden by local practice, *Fowler v. United States,* 5 Cir., 1962, 310 F.2d 66, the rule in this circuit, most recently enunciated in *United States v. Selva,* 5 Cir., 559 F.2d 1303, decid-

ed Sept. 28, 1977, is that "[w]hen . . . a criminal defendant is represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion . . . of the record" will result in a presumption of prejudice sufficient to mandate reversal, *Selva*, at 1306. Where, however, a defendant is represented on appeal by his trial counsel reversal is not required absent a showing that the failure to record and preserve the missing portion of the trial proceeding visits a hardship upon him and prejudices his appeal. *Id.* at 1305. In this case two of the three appellants are represented before us by their original trial counsel. No presumption is therefore available to them. *Cf. Addison v. United States*, 5 Cir., 1963, 317 F.2d 808. Appellants do allege that rulings of importance were made during the unreported conferences, that extraneous and prejudicial evidence was admitted over defense objections, that the court may have improperly restricted defendants' right to make further objections during the course of the trial, and that the absence of a complete trial transcript precludes appellants from challenging these rulings. It does not appear that any attempt has been made to supplement the record by reconstructing the missing portions of the transcript, *see Selva*, slip op. at 6190, 559 F.2d 1303, at 1304, and it is not necessary to the disposition of this case for us to determine whether the allegations of prejudice made by appellants are sufficient to satisfy the rule laid down in *Selva* and its antecedent cases. Nevertheless, we strongly disapprove of the court's failure to require the recording of bench conferences and, speaking as a panel only, we suggest that if the trial court needs to confer with counsel about rulings to be made from the bench the safe course is to excuse the jury or retire to chambers and let the reporter record what takes place.

The judgment of the District Court in this case as to all defendants on all counts is reversed. The case is remanded for the entry of judgments of acquittal.

**REVERSED AND REMANDED.**

# APPENDIX

Opinion of District Judge Alexander Lawrence
Westberry v. Gilman Paper Company, 60 F.R.D. 447 (D.C.1973)

## THE ACID–POURING INCIDENT IN 1970

According to the record before this Court, the employment of Wyman Westberry was terminated by Gilman Paper Company on September 25, 1972. Plaintiff was discharged for allegedly pouring a toxic or acid-type liquid on a black employee (Rawls) on March 21, 1970, while the latter was using a restroom that had been exclusively used by white employees.

The origin of the litigation in this Court apparently goes back to the use by Negro employees of lavatory facilities at the St. Marys plant. The restrooms were *de facto* segregated. Raymond Dyals, a machinist and a member of the Grievance Committee of the local Union, testified that prior to the injury to Rawls he had a conversation with Westberry regarding the use by blacks of the toilets in the Maintenance Department. The plaintiff informed Dyals that a black man had come in and used the restroom and requested that he go to the company officials and try to have this prevented. Not long after this, Westberry told him that another black was using the restroom. Dyals conveyed these complaints to a Gilman official (Crawford) who told him "there was nothing that they could possibly do about it, it was here and we'd have to contend with it." According to Dyals, he related this information to Westberry who replied, "There was something that could be done about it" and "if the right stuff was thrown on there, it wouldn't take but one time and it would alleviate the problem." The nature of the "stuff" was not identified but Dyals got the impression that it would probably cause serious injury to a person.[4] Apparently, this conversation occurred in

[4] Rawls received first and second degree burns on his head and in the scrotum area. Tr. 10.

the latter part of 1969. See Arbitration Case, Tr. 16–20.

J. T. Blount was employed by Gilman Paper Company as an instrument mechanic in 1970. He testified that there were two metal tanks in the caustic room which contained what is known as "white liquor." This liquid is used in the digesters and when steam is applied, acts to soften pulpwood; in Blount's words, "eats the

## APPENDIX—Continued

wood so you can cook it." [5] Tr. 55. A night or

5. According to the record, "white liquor" is a caustic soda used in the processing of paper and is capable of causing severe burns when the skin is exposed to it. Tr. 10.

so before Rawls received the burns the witness saw Westberry draw "white liquor" from one of the tanks and place it in a Wedac plastic jug, a container used to carry oil taken from a larger tank. Blount learned a day or two later that Rawls had been injured. Tr. 58–62. Asked why he did not say anything about it, this witness explained, "I might have been like a lot of the rest of them; I just don't want—the niggers was using our restrooms at that time and they was using our water fountains and our restrooms and I just didn't say anything about it." Tr. 62.

James McGhin who was employed as a welder at the time Rawls was injured testified that on the night of the acid-throwing incident he and Westberry were coming out of the restroom when a black worker entered it. Plaintiff said something like "Who does he think he is, using our restroom?" Tr. 69–70. Westberry then picked up a beaker from a nearby shelf which he (plaintiff) said contained "white liquor." He told McGhin that "he could get him out of there." [6] Tr. 71. Westberry proceeded to

6. Bobby Mallard who was employed by Gilman as a shipping supervisor testified that on the morning before Rawls was injured he was in the storeroom and that Westberry came in and asked the storekeeper for something to put acid in. The storekeeper at first replied he had nothing but then handed the plaintiff a glass quart jar beaker. Tr. 40–41.

climb up on a rack over the toilet (it is also referred to as a "little ladder." Tr. 120. At that point, McGhin turned and left through a door and started up the stairs. Meanwhile, he "heard the nigger screaming." Tr. 74. Immediately thereafter, Westberry caught up with McGhin and told that "he got his so-and-so out of there." Tr. 73–74.

McGhin testified that he saw Westberry "as he got up there, started to do it, and I took off as he got up there to do it." He would not admit that he saw plaintiff actually throw the liquid. He said he did not see it being poured because as Westberry "got up and started to commit the act, I left; I turned my back." After the Federal Bureau commenced an investigation into the case in the fall of 1970 Westberry visited McGhin. According to the latter, he said to him, "Wyman, you know this is the truth, just as good as anything" and that Westberry replied, "I'll do anything or give you anything you want if you will keep your mouth shut." Tr. 88–89. Subsequently, when the incident was aired at a Union meeting Westberry got up before the members, testified McGhin, and "said that he didn't do it, and I was sitting there knowing it and he dropped his head and wouldn't even look at me." Tr. 83.

Reverend William Carlton Owens, a Vocational Rehabilitation Counsellor and a Baptist minister, testified that in 1970 he was Pastor of St. Marys Baptist Church and that McGhin was a member of the congregation. Some months after the incident McGhin came to him and confided that he was aware of the identity of the person who perpetrated the act and that he was wrestling with his conscience about what to do. Reverend Owens said he encouraged him to tell the truth. Tr. 123; also 78. Another witness, Marvin C. Jordan, a welder, testified at the Arbitration hearing that the night after the incident he had a conversation with McGhin who told him that he had a secret to tell which he wanted him to keep under his chest. He thereupon divulged that Westberry had poured acid on a black construction worker. Jordan later saw plaintiff and asked him about the incident. Westberry said, "I didn't pour acid on him, I poured white liquor on him." Tr. 125–127.

Westberry has consistently denied any involvement in the incident. Q. "Did you, in fact, throw any acid on anybody?" A. "No sir." Tr. 140. He denied that he placed "white liquor" in a plastic container. Tr. 155–156. The minutes of a meeting of the members of Local No. 1128, I.A.M., apparently held in September, 1972, recite that "Brother Westberry stated he was innocent." Tr. 185. When plaintiff was handed the termination letter on September 25th that year, Cecil Gay, vice chairman of the Union, who was present, testified that Westberry asked the Gilman representative, "Why are you firing me when I'm not guilty and not showing no information?" Tr. 192–193. Plaintiff was deposed by the defendants on February 2, 1973. He testified that he did not know the name of the injured black employee and had heard only general talk on the subject. Westberry Deposition, 12–13.

The wrongful discharge of Westberry is pleaded as an overt act in the conspiracy of the defendants. The foregoing summary of the testimony in connection with the termination of his employment is perhaps more pertinent to the arbitration proceeding than to the motions for summary judgment in the § 1985 action. A decision has not been made by the Arbitrator. Nothing in the present litigation can affect or influence his findings in the grievance claim. Anything this Court may decide does not bind the Arbitrator and what he may find is not binding in this action.[7]

7. Except that unjust enrichment which results from duplicate monetary relief in the public and private forums in a labor grievance case is not permissible. *Hutchings v. United States Industries, Inc.*, 428 F.2d 303 (5th Cir.); *Rios v. Reynolds Metals Company*, 467 F.2d 54 (5th Cir.).

It is clear, in any event, that questions of fact and of credibility exist as to the grounds of termination of employment which preclude any summary judgment by this Court. However, in the conspect of things, what occurred on the

## APPENDIX—Continued

night of the acid-pouring incident is significant to proper understanding of the claim of a conspiracy and resulting denial of plaintiff's constitutional rights.

### CONSPIRACY TO TAKE WEST-BERRY'S LIFE

The other overt act and the one primarily relied on by plaintiff is his claim that the defendants conspired to take his life by offering money to someone to kill him. According to the complaint, "On or about April 9, 1972, defendants Brumley, Thomas and Harrison, acting on behalf of defendant Gilman Paper Company, conspired among themselves to deprive plaintiff of his life. In furtherance of said conspiracy, Brumley, Thomas and Harrison offered to one Lawrence Brown, Sr., a sum of money if he, Brown, would kill plaintiff. Brown refused said offer of money, and reported same to plaintiff."

Westberry testified at the arbitration hearing that George Beaver called him one day and said he wanted to talk to him. When they met, Beaver told him, "Would you believe that George Brumley, Robert Harrison and Tommy Thomas has offered somebody money to kill you?" Tr. 142. After receiving this information Westberry asked him to set up a meeting with the person who had been requested "to kill me." He met with Lawrence E. Brown, an employee of Gilman Paper Company, whom he had previously known. According to the plaintiff, Brown told him that Brumley, Harrison and Thomas had offered him money to kill Westberry. "I said to myself, well, if this guy is telling the truth, he won't mind telling the F.B.I. this, so I asked Mr. Brown, I said, will you tell the F.B.I. this? And he said, yes." Deposition, p. 19.

The record contains an affidavit by Brown dated May 15, 1972. Brown deposed that Beaver and Westberry approached him to make "some kind of deal"—a story they wanted him to tell. He was to say that he called George Beaver on the job; and that thereafter the latter was to call Westberry who was to meet him at the gate. "Me and George was to be discussing our union problem then we was going to walk over to my automobile. When I got over to the car Wyman was to call me a nigger and push me. When he pushed me I was to get my pistol and blow him out (kill him)." In accordance with the plan, Brown was then to go to Thomas's house and pick up $1500 cash. He was to say that Thomas, Brumley and Robert Harrison would see to it that if he went to court, he would make no time. Affiant was to state that he had been approached by these three individuals.

According to Brown's affidavit, Beaver and Westberry told Brown that if he betrayed them, they would first say that he was lying and "next they would kill me or have me killed." Affiant stated that he received $600 or more which was deposited by Beaver in a bank at Kingsland. Brown said that he was hired by Westberry and Beaver and a prominent resident of Camden County. According to his affidavit, he went to Tommy Thomas, a defendant herein, and told him the story.

On May 31, 1972, George A. Beaver signed an affidavit which is part of the record in this case. He swore that a prominent resident of Camden County was planning to bring a "very profitable" damage suit against Gilman Paper Company and thought that the chances of an "out-of-court" settlement would be increased if Brown would say that Brumley, Harrison and Thomas had hired him to kill Westberry. According to Beaver's affidavit, the following story was concocted:

"Tommy Thomas was to call Lawrence Brown and ask him to meet him at Ralph Bunch High School. Tommy Thomas was driving a big green car with Robert Harrison and George Brumley present. Tommy Thomas was then to proposition Lawrence Brown to kill Wyman Westberry in the following way: That Lawrence Brown was to call me concerning a union problem and I was to get in touch with Wyman Westberry who would meet us at the front gate. We were to walk out towards Lawrence Brown's car. On the way there, Wyman Westberry was to call him a nigger, this was to upset Lawrence Brown and I was to intervene and when I did, Lawrence Brown was to pull out his pistol and shoot Wyman Westberry. Tommy Thomas was going to have witnesses to verify the story and Lawrence Brown was to leave the parking lot and go to Tommy Thomas' house where he would receive $1,-500.00 and Tommy Thomas would see to it that Lawrence Brown did not go to jail. . . ."

Brown and Beaver subsequently signed retractions of their statements. In another affidavit by Lawrence Brown dated May 25, 1972, he repudiated what he had said in a prior affidavit. He explained that he was forced by Tommy Thomas to change his statement that Thomas, Harrison and Brumley had offered him money to kill Westerberry. According to Brown, Thomas and two other men came to his house on the night of May 9th and pointed guns at him. They took him to Thomas's house where he spent two nights. They later went to Vero Beach where they stayed four days. Brown was subpoenaed to appear before a federal grand jury at Savannah on May 17th and drove with Thomas to that city. The latter told him "that if I didn't say what he told me to say that he would blow my brains out . . . He also told me that if I told what he wanted

## APPENDIX—Continued

me to say, I would receive $10,000 and a lifetime job."

George Beaver signed (apparently in June, 1972) a retraction of the affidavit he had given on May 31st of that year. In the recanting statement, witnessed by a notary, he set forth at length the background of his giving the prior affidavit. His account is long and rambling but

it repudiates what he had previously sworn to in regard to the hiring of Brown.