**In the Matter of Isaac SILVERMAN, Bankrupt.**

**Bankruptcy No. 77 B 2988.**

United States Bankruptcy Court, S. D. New York.

Oct. 15, 1979.

Leinwand, Maron, Hendler & Krause, New York City, for Bankrupt.

Weil, Gotshal & Manges, New York City, for James Talcott, Inc.

DECISION ON MOTION TO DISMISS COMPLAINT AND FIRST AMEND-ED COMPLAINT OF JAMES TAL-COTT, INC. OBJECTING TO BANK-RUPT'S DISCHARGE

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The abovenamed bankrupt has moved to dismiss the complaint of James Talcott Inc., the plaintiff in an adversary action involving the plaintiff's objection to the bankrupt's discharge. The bankrupt's motion is predicated on the allegation that the objection to his discharge is permeated with bad faith in that the conduct of counsel and employees of the plaintiff constituted subornation of perjury.

On January 22, 1979 Talcott filed and served its amended complaint objecting to the bankrupt's discharge. The bankrupt filed his answer on February 2, 1979. The bankrupt then filed an amended answer on July 20, 1979. Talcott then served a first amended complaint on July 20, 1979. The bankrupt contends that Talcott's objection to his discharge was instituted solely for the purpose of compelling and coercing the bankrupt to testify falsely in another proceeding in which Talcott expects to seek recovery under a fidelity bond.

The parties appeared at the hearing on the motion, testimony was given and evidence was adduced resulting in the following Findings of Fact:

1. The bankrupt originally filed a petition for a real estate arrangement under Chapter XII of the Bankruptcy Act. The erstwhile debtor was unable to post an indemnity against future losses, as ordered by this court, and was thereafter adjudicated on May 12, 1978.

2. In March or April of 1979 the bankrupt appeared at Talcott's office at his own request and without the knowledge of his counsel. The bankrupt discussed with Mr. David Cumming a vice president of Talcott the possibility of working out some sort of settlement involving the bankrupt's affairs with Talcott. Mr. Cumming advised the bankrupt that his proposal was too vague and that Talcott would not be willing to enter into any settlement with him which would allow the bankrupt to retain any equity in his former properties.

3. During the course of this discussion Mr. Cumming informed the bankrupt that Talcott intended to assert a claim under a fidelity bond with regard to the losses it sustained in connection with advances which it made to the bankrupt. Mr. Cumming informed the bankrupt that Talcott would value any evidentiary material that he had that would be helpful in recovering under its fidelity bond and that Talcott would be willing to structure a settlement with the bankrupt based upon his cooperation. The bankrupt testified that Mr. Cumming asked whether or not the bankrupt knew of, or gave, any bribes to Talcott employees. The bankrupt responded that he was uncertain as to Mr. Cumming's meaning and wanted to know whether or not Mr. Cumming was asking if the bankrupt gave any bribes. When Mr. Cumming answered affirmatively the bankrupt became irate and heatedly replied that he had not given any bribes to Talcott employees other than a present of several bottles of liquor for a Christmas party.

4. Several months later, perhaps in early July, 1979, the bankrupt telephoned Mr. Cumming and arranged for another meeting with Talcott, again for the purpose of discussing some sort of settlement. The bankrupt proposed that if Talcott would allow him to retain an equity in 354 Broadway, New York, New York, one of the properties previously owned by the bankrupt's corporation, that the bankrupt would be willing to help Talcott obtain a tenant for one of the vacant properties in White Plains, New York. The bankrupt also advised Mr. Cumming that Talcott was depriving the bankrupt of his ability to earn a living and continued to do so through harassing efforts in connection with Talcott's objections to his discharge.

5. The bankrupt testified that at this meeting he was informed by Mr. Cumming that if the bankrupt would testify that he bribed Talcott employees, Talcott would be willing to withdraw its objection to his discharge. This point was confirmed by Mr. Cumming who testified that he did not believe the bankrupt the first time when he heatedly denied any such bribes. Accordingly, Mr. Cumming stated to the bankrupt that if the bankrupt did not have any documentary evidence there was no need to pursue this line of discussion. Mr. Cumming confirmed that if the bankrupt could produce solid documentary evidence of infidelity concerning Talcott employees, Talcott then would be willing to withdraw its objection to the bankrupt's discharge.

6. The bankrupt again stated that Talcott was destroying his ability to earn a living. The bankrupt asked Mr. Cumming if Talcott wanted him to testify as to bribes

given to Talcott employees. Mr. Cumming stated that Talcott wanted evidence of infidelity if it had occurred. The bankrupt inquired of Mr. Cumming whether Talcott was asking the bankrupt to lie. Mr. Cumming said "no." Mr. Cumming testified that he asked the bankrupt specific questions with respect to advances made by Talcott. The bankrupt answered that these advances had not involved any dishonesty or any infidelity on the part of Talcott employees.

7. Mr. Marra, another vice president of Talcott, who was present at the July meeting confirmed that he advised the bankrupt that if the bankrupt had any documentary evidence establishing infidelity of Talcott's employees that Talcott would like to have the documents and that absent such evidence there was nothing to talk about regarding the withdrawal of Talcott's objection to the bankrupt's discharge. Mr. Marra confirmed that the bankrupt denied ever bribing any Talcott employees with the exception of giving several bottles of liquor to a Christmas party. Additionally, Mr. Marra confirmed that the bankrupt accused Talcott of trying to destroy him.

8. Elliot Krause, counsel for Mr. Silverman testified that on June 18, 1979, he met with Michael Cook, at Weil, Gotshal & Manges, attorneys for Talcott, to discuss ways and means of resolving a substantial litigated matter concerning Talcott's objection to the bankrupt's discharge. Discussion ensued with respect to a subpoena served on the bankrupt in the discharge litigation and the proposed settlement which would thereafter be submitted to Talcott for its approval.

9. On June 17, 1979, Martin Bienenstock of Weil, Gotshal & Manges telephoned Mr. Krause and asked whether the bankrupt would be produced at the offices of Keane & Butler, attorneys for Talcott in a proposed action by Talcott under its fidelity bond covering infidelity of Talcott's employees. Mr. Bienenstock informed Mr. Krause that Keane & Butler wanted to use the bankrupt in connection with its claim under its fidelity bond to establish that

employees of Talcott had accepted bribes in exchanges for the loans and credit extended by Talcott to the bankrupt and his various entities.

10. Mr. Krause testified that Mr. Bienenstock said that as a condition to the release or withdrawal of Talcott's objection to the bankrupt's discharge the bankrupt would have to submit himself to Keane & Butler. Mr. Krause further testified that Mr. Bienenstock said that Talcott would not execute a release unless testimony Silverman was to give was satisfactory to Talcott with respect to any action on the fidelity bond.

11. Mr. Bienenstock testified that there was no intention of having the bankrupt testify in the fidelity bond action. He said that he told Mr. Krause that the only thing that Talcott was interested in was obtaining "documents." "If he [the bankrupt] had documents speak to Keane & Butler."

12. Mr. Krause thereafter testified that Mr. Bienenstock never used the phrase "documentary evidence" and that what was requested was testimony from the bankrupt. Mr. Krause testified that he thereafter contacted Mr. Fitzgerald of Keane & Butler who said that he didn't want to examine the bankrupt and that Fitzgerald did not want to meet with the bankrupt unless Mr. Krause was prepared to verify that the bankrupt would admit that he had bribed Talcott employees.

13. Mr. Krause informed the bankrupt of his conversations with Messrs. Bienenstock and Fitzgerald. The bankrupt then advised Mr. Krause of his previous meetings with Mr. Cumming in March or April of 1979 and in July of the same year and that he could not understand why Talcott placed emphasis on any activity on his part in connection with bribes.

14. The hearing was reopened at Talcott's request so as to offer the testimony of Mr. Fitzgerald of Keane & Butler with respect to the substance of his telephone conversation with Mr. Krause on June 28, 1979.

15. Mr. Fitzgerald testified that as a result of a conference held at Talcott's of-

fice on June 20, 1979, Mr. Bienenstock of Weil, Gotshal & Manges was to call Mr. Krause and have Mr. Krause contact Mr. Fitzgerald as to any information that the bankrupt might have concerning infidelity of Talcott employees.

16. Mr. Fitzgerald further testified that on June 28, 1979 he received a telephone call from Mr. Krause at Mr. Bienenstock's suggestion. Mr. Fitzgerald said that he interrupted Mr. Krause to say that he did not want to speak to the bankrupt and that he wanted whatever documents or information that the bankrupt had that would confirm the bankrupt's proposed testimony regarding infidelity of Talcott's employees. Mr. Krause replied that this was an unusual request, to which Mr. Fitzgerald responded that the bankrupt's credibility would be suspect and that is why he was proceeding in that fashion. This point was confirmed by a memorandum to the file that Mr. Fitzgerald proposed minutes after the telephone conversation, which reads as follows:

"MEMORANDUM

DATE: June 28, 1979
TO : File
FROM: RF
RE : *Talcott Reliance*

Telephone call from Elliott Krause. Krause said he understood I wanted to speak with Silverman. Told him I did not want to speak with Silverman. Told him I only wanted him to speak with Silverman and to determine Silverman's knowledge, if any, of infidelity of JTI's employees and to obtain from Silverman whatever documents, if any, confirmed such knowledge. Told him I wanted documents sent to me and, after receiving documents, that I would like to speak with him about documents in relation to whatever Silverman told him. Told him that, if documents contained any relevant information, I might want to talk with Silverman at some later point in time for purposes of authentication."

17. Mr. Krause, similarly, dictated a memorandum to the File on June 28, 1979 which is corroborated by Mr. Fitzgerald's memorandum and reads as follows:

"DATE: June 28, 1979
MEMORANDUM TO: FILE
SUBJECT: *ISAAC SILVERMAN*
FROM: ELLIOT L. KRAUSE

In accordance with my telephone conversation with Martin Bienenstock, I called a Mr. Fitzgerald at Keane & Butler.

At the outset I told Mr. Fitzgerald that I was calling him as a result of a conversation I had with Martin Bienenstock of Weil, Gotshal & Manges. I had been told that Mr. Fitzgerald's firm was representing Talcott in an action by Talcott against certain officers or employees on a fidelity bond.

Mr. Fitzgerald told me that he merely wanted verification of the fact that Silverman at some time, without fixing any date, had bribed certain employees of Talcott.

I told Fitzgerald that this was, to say the least, an unusual request and in fact, I indicated that I did not want to continue the conversation. Then again Fitzgerald repeated that 'he didn't want to get involved in any talks with Silverman until he had verification through me of what Silverman was prepared to tell him.'

I told Fitzgerald that despite the unusualness of his request, I would call Silverman and arrange to meet with him."

■ 18. From the foregoing I do not find that the bankrupt has established that Talcott expected the bankrupt to testify falsely with respect to its claim under its fidelity bond or that it exerted any pressure to coerce the bankrupt into giving false testimony. At most it can be found that Talcott dangled the discontinuance of its objections to the bankrupt's discharge as consideration for his cooperation in the assertion of Talcott's claim under its fidelity bond if the bankrupt could furnish satisfactory evidence of any infidelity on the part of Talcott employees.

■ 19. It matters not whether Talcott sought testimonial evidence from the bankrupt, as the bankrupt contends, or documen-

tary evidence of infidelity, as Talcott asserts, since there is no proof that Talcott expected to obtain, or in any manner persuaded, the bankrupt to give false testimony with respect to Talcott's claim under its fidelity bond. That Talcott did not believe the bankrupt when he told Talcott that he did not bribe any of its employees and that Talcott indicated a willingness to consider the withdrawal of its objections to the bankrupt's discharge in exchange for his furnishing evidence of the infidelity of Talcott's employees in connection with substantial advances to the bankrupt and his business operations, does not constitute subornation of perjury or coercion to extract false testimony.

█ 20. Since Talcott's complaint objecting to the bankrupt's discharge was served and filed on January 22, 1979, and since the issue with respect to Talcott's fidelity bond did not arise until after the bankrupt, unbenounced to his counsel, Mr. Krause, requested a meeting with Talcott's representatives to discuss settlement of Talcott's complaint in March or April of 1979, it cannot be said that Talcott filed its complaint objecting to his discharge as a ploy to coerce the bankrupt into giving false testimony with respect to Talcott's claim under the fidelity bond.

█ 21. Moreover, there is no credible evidence that Talcott filed its objections to the bankrupt's discharge merely to extract cooperation from the bankrupt with respect to its fidelity bond claim. Indeed, Talcott's motive in filing the objections is irrelevant to the issue of whether or not the bankrupt is entitled to a discharge in bankruptcy.

## DISCUSSION

In moving to dismiss Talcott's complaint objecting to his discharge in bankruptcy the bankrupt contends that Talcott is guilty of unclean hands and is motivated by bad faith for the sole purpose of eliciting the bankrupt's false testimony in a contemplated action to be commenced by Talcott under a fidelity bond insuring Talcott from infidelity of its employees, and especially those who authorized loans by Talcott to the bankrupt and his business operations. Simply put, the bankrupt presents the issue in the context of whether or not Talcott executed pressure in an attempt to coerce the bankrupt to give false testimony in exchange for withdrawal of the objections to his discharge.

█ Initially it should be observed that subornation of perjury, as set forth in 18 U.S.C. § 1622 is not involved, since to constitute this offense, perjury must have been actually committed. *United States v. Brumley*, 560 F.2d 1268 [5 Cir. 1977]. It should also be noted that there is no question that the Bankruptcy Court is a court of equity and its equitable powers may be invoked to the end that fraud will not prevail. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. However, the issue raised by the bankrupt is whether a creditor may file objections to the bankrupt's discharge which are facially within the proscription of Section 14 of the Bankruptcy Act if the creditor's conduct is not in good faith and with the expectation of gain. The bankrupt's argument elides the point that the bankruptcy court must exercise its equitable powers to protect all creditors of the estate. If a bankrupt's conduct does not warrant the granting of his discharge, the lack of good faith or unclean hands on the part of the objecting creditor does not prevent the trustee in bankruptcy or other creditors from taking up the cudgels and continuing the objections to discharge. Indeed, the objecting creditor may not withdraw a complaint objecting to the bankrupt's discharge without notice to the trustee and the other creditors who may then intervene and press the objection on their own. *Bankruptcy Rule 741*. Thus, the objecting creditor's conduct or motive is irrelevant to the issue of whether the bankrupt is entitled to receive a discharge of his obligations. A bankrupt whose conduct does not justify the salutary benefits afforded by a discharge of his obligations to all of his creditors should not be heard to say that, notwithstanding such conduct, his objecting creditor lacks clean hands or proper motives in bringing to light his objection-

able activities. *In re Hanson*, 309 F.Supp. 810 [D.C.Minn.1970]. See also *Cunningham v. Elco Distributors*, 189 F.2d 87 [6 Cir. 1951].

In any event, this court has found that Talcott, the objecting creditor, did not attempt to coerce the bankrupt to give false testimony in exchange for withdrawal of the objections to his discharge. Apart from whether a withdrawal would be effective within the context of Bankruptcy Rule 741, it nevertheless appears that Talcott indicated that it would consider a withdrawal of its objections in consideration for satisfactory cooperation from the bankrupt in its contemplated action under the fidelity bond. Evidently Talcott believed that the substantial advances to the bankrupt and his business operations could not have occurred without infidelity on the part of some of its own employees. Such belief, whether well-founded or not, does not adversely reflect upon its motives for objecting to the bankrupt's discharge, even if such motivation was a relevant issue; which it is not.

### CONCLUSIONS OF LAW

1. The bankrupt's motion to dismiss Talcott's objections to his discharge is legally and factually unsupportable, and, therefore, is dismissed.

2. Talcott's request for costs and attorney's fees shall await a determination on the merits of its complaint objecting to the bankrupt's discharge.

SO ORDERED.